RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 08a0319p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

RICKY DALE RAILEY,

       *Petitioner-Appellant,*

    *v.*

No. 06-5806

PATTI WEBB, Warden,

       *Respondent-Appellee.*

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 05-00345—John G. Heyburn II, Chief District Judge.

Argued: December 6, 2007

Decided and Filed: August 26, 2008

Before: BATCHELDER and MOORE, Circuit Judges; BUNNING, District Judge.[*]

_____

**COUNSEL**

**ARGUED:** David A. Nenni, DINSMORE & SHOHL, Cincinnati, Ohio, for Appellant. Michael L. Harned II, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Appellee. **ON BRIEF:** David A. Nenni, Michael J. Newman, DINSMORE & SHOHL, Cincinnati, Ohio, for Appellant. Michael L. Harned II, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Appellee.

    BATCHELDER, J., delivered the opinion of the court, in which BUNNING, D. J., joined. MOORE, J. (pp. 22-30), delivered a separate dissenting opinion.

_____

**OPINION**

_____

    ALICE M. BATCHELDER, Circuit Judge. Petitioner Ricky Dale Railey appeals the district court's order denying his 28 U.S.C. § 2254 petition for writ of habeas corpus. Railey argues that judicial bias, ineffective assistance of trial counsel, and his invalid plea of guilty warrant reversal of the district court's decision. We disagree and affirm the judgment of the district court.

---

[*] The Honorable David L. Bunning, United States District Judge for the Eastern District of Kentucky, sitting by designation.

## I. BACKGROUND

The following background facts are taken from the Kentucky Court of Appeals' opinion that affirmed the state trial court's denial of Railey's post-conviction motion:

> Railey and his girlfriend engaged in an altercation. Railey went out to target shoot afterwards [and] claims that his pistol accidentally discharged while he was returning it to the closet after target practice. The shot struck and injured his girlfriend. During questioning by the police, the girlfriend contended that Railey had assaulted her twice in the past. The girlfriend described an incident where Railey beat her severely with a belt, and a second incident in which he held a knife to her throat and cut her[, which] left scarring on [her] neck. Railey claims that the prior incidents were merely 'lover's play.' Railey was charged with assault, first degree, for the shooting, and two counts of assault, second degree, for the prior actions.

*Railey v. Kentucky*, Nos. 02-CR-00052 & 61, 2004 WL 2201368, *1 (Ky. Ct. App. Oct. 1, 2004).

On February 3, 2003, Railey entered a guilty plea and, on March 20, 2003, the court sentenced him to prison — ten years for the first-degree assault and five years for each of the second-degree assaults, all to run concurrently. Railey did not move to vacate his guilty plea, nor did he file a direct appeal. Instead, Railey, acting *pro se,* filed a motion with the trial court, pursuant to Kentucky Rule of Criminal Procedure 11.42, seeking to vacate the judgment and the sentence. Railey argued that: (1) his guilty plea was not entered knowingly, voluntarily, and intelligently; (2) his trial attorneys were ineffective because they failed to investigate the charges adequately, failed to consult with him regarding trial strategy, failed to present a defense, and failed to appeal the denial of his motions to reduce his bond; and (3) the trial judge was biased because he is the nephew of the state prosecutor, who personally participated in some of the proceedings. On October 1, 2004, the post-conviction court — the same court that accepted Railey's guilty plea and sentenced him — denied Railey's Rule 11.42 motion. Railey appealed to the Kentucky Court of Appeals, which affirmed, and sought further review in the Kentucky Supreme Court, which denied the request.

Railey filed a § 2254 petition for a writ of habeas corpus in the Western District of Kentucky, alleging three constitutional violations. Railey argued that his defense attorneys were ineffective on two bases: they misinformed and misadvised him when he entered his guilty plea and they failed to investigate the charges and potential defenses in his case adequately. Railey also protested his guilty plea on two bases: that it was not supported by the evidence (because he did not intend to harm his girlfriend and therefore lacked the requisite intent for assault) and that it was not knowing, intelligent, and voluntary (because he did not understand the law in relation to the facts; specifically, the requisite intent for each of the crimes). Finally, Railey asserted that the trial judge's failure to recuse himself *sua sponte*, due to his familial relationship with one of the prosecutors, violated Railey's due process right to a fair trial. The district court denied Railey's petition.

The district court granted Railey a Certificate of Appealability on two issues — the ineffective assistance of counsel and the propriety of his guilty plea. We added the third issue — the due process issue concerning the trial judge's appearance of bias.

## II. ANALYSIS

Railey filed for habeas relief in June 2005, so the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) applies. Under AEDPA, a writ may not be granted unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law," meaning Supreme Court precedent, or "was based on an unreasonable determination of facts in light of the evidence presented" during the state court proceedings. 28 U.S.C. § 2254(d)(1)-(2).

On appeal, we review the district court's legal conclusions *de novo* and its factual findings for clear error. *White v. Mitchell*, 431 F.3d 517, 523-24 (6th Cir. 2005). Mixed questions of law and fact are reviewed under the "unreasonable application" prong of the AEDPA. *Id.* The state court's factual findings are presumed correct and may be disturbed only upon a petitioner's showing by clear and convincing evidence that the factual findings were incorrect. *Id.*

## A. Judicial Bias

Railey claims that he was denied a fair trial because of an impermissible appearance of judicial bias. The crux of this claim is that Judge Allen Ray Bertram, the Marion County (Kentucky) Circuit Court judge who presided over his plea hearing and sentencing, is the nephew of George Barry Bertram, the Marion County Commonwealth Prosecutor. Prosecutor Bertram participated personally in two of the hearings before Judge Bertram — a hearing on a motion to reduce bond and the plea hearing — but Railey does not allege any actual bias during these hearings. Railey argues that due process demanded that Judge Bertram recuse himself to avoid even the appearance of bias.

In the state post-conviction proceeding, the Kentucky Court of Appeals made a factual determination that Railey had "waived" any challenge to the qualification of Judge Bertram:

> Railey argues that there was a relationship between the trial court and the prosecution such that the judge should have recused himself. The record shows that the judge is the nephew of the Commonwealth's Attorney. This relationship was previously known to defense counsel, and was made known to all parties before trial. Railey was notified of the relationship, and waived the disqualification of the judge.

*Railey*, 2004 WL 2201368 at *2. The state court also made the determination, under state law, that Railey was required to show *actual* bias, that he failed to show actual bias, and that he consequently failed to show that he had been prejudiced or that his constitutional rights were violated.[1]

> The appellant must show bias on the part of the court such that the judge could not be impartial in the case. No evidence of bias is presented by Railey, other than the contention that he was denied bail. The trial court is vested with the discretion to determine whether bail is appropriate. Railey has made no showing that the trial court abused its discretion. The claim that Railey's constitutional rights were prejudiced is unsupported by the record before this Court. We affirm the trial court's ruling.

*Id.* (citations omitted) (citing *Brand v. Kentucky*, 939 S.W.2d 358, 359 (Ky. App. 1997) (holding that "[t]he burden of proof required to demonstrate that recusal of a trial judge is mandated is an onerous one[:] It must be shown that the trial judge is prejudiced to a degree that she cannot be impartial"); *see also Marlowe v. Kentucky*, 709 S.W.2d 424, 428 (Ky. 1986) (requiring "evidence of actual bias"); *Johnson v. Ducobu*, 258 S.W.2d 509, 511 (Ky. 1953) (emphasizing that "we have never gone so far as to require the disqualification of a judge simply because a party does not believe he will be afforded a fair trial"). In his federal habeas petition, Railey asserts that he need not show actual

---

[1] The Kentucky court actually used the word "prejudiced" rather than "violated" —"The claim that Railey's constitutional rights were prejudiced is unsupported by the record before this Court." This, of course, is not the way in which courts ordinarily use the word "prejudice." Ordinarily, we consider whether a *party* was prejudiced and whether a constitutional right was *violated*. Indeed, we often consider whether a party was *prejudiced* because a constitutional right was *violated*. In the present construction — the Kentucky court's assessment of Railey's constitutional rights — the question is indisputably whether Railey's rights were *violated*. And, the use of the word "prejudiced" in this context is clearly incorrect, but we think that it is also clearly attributable to simple inadvertence on the part of the Kentucky court. We will therefore give that court the benefit of the doubt and assume that it meant that Railey was not prejudiced and his rights were not violated, a reading that is supported by the entire context of the court's holding.

bias, but that "the trial judge's close familial relationship with the prosecuting attorney is conclusive evidence of judicial bias in violation of the Due Process Clause of the Fourteenth Amendment."

In ruling on Railey's appeal we must be mindful of our limited role under § 2254, which confines us to conducting particular inquiries into the state court's specific determinations. In this case: (1) whether the court's factual determination[2] that Railey had waived his challenge to Judge Bertram's qualification was incorrect and based on an unreasonable determination of the evidence presented; (2) whether the court's legal determination that — as a matter of state law — Railey was required to show actual bias was contrary to or an unreasonable application of clearly established Supreme Court precedent; and (3) whether the court's constitutional determination that Railey's constitutional rights had not been violated was contrary to or an unreasonable application of clearly established Supreme Court precedent, or based on an unreasonable determination of the facts. For ease of analysis, we may consider these three issues out of order and resolve the easiest first.

The second issue is simply not within our scope of review — we do not consider on habeas review a state court's determination of state law. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.") (citing *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975)). And, the first issue is slightly more taxing than the second, but ultimately, turns on the outcome of the third issue. That is because judicial bias, the subject of the third issue, is not susceptible to forfeiture — while the record certainly suggests that Railey *forfeited* this claim by failing to object to Judge Bertram, the record is devoid of any evidence that Railey pro-actively *waived* this claim. *See United States v. Olano*, 507 U.S. 725, 733 (1993) ("Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." (quotation marks omitted)). But "jurists often use the[se] words interchangeably," *Kontrick v. Ryan*, 540 U.S. 443, 458 n.13 (2004); *see also Freytag v. C.I.R.*, 501 U.S. 868, 895 n.2 (1991) (explaining that forfeiture and waiver "are not really the same, although our cases have so often used them interchangeably that it may be too late to introduce precision"), and we can reasonably construe the Kentucky post-conviction court's label of "waiver" as actually a finding of "forfeiture." Nevertheless, it is beyond dispute that judicial bias is structural error, not susceptible to forfeiture (or harmless error analysis). *See Washington v. Recuenco*, 548 U.S. 212, 126 S. Ct. 2546, 2551 n.2 (2006); *Sullivan v. Louisiana*, 508 U.S. 275, 283 (1993).

Because we find, as we must, that Railey did not *waive* the claim — at most, he *forfeited* the claim — issue three is dispositive of issue one. That is, if the outcome of issue three is a finding of judicial bias in violation of due process, then even a finding of forfeiture was clearly improper (i.e., a reviewing court cannot disregard a judicial-bias error on the theory that the defendant failed to preserve it or suffered no actual prejudice from it). Alternatively, if there was no judicial bias, then the court's disregarding of Railey's claim (be it by forfeiture or waiver) was irrelevant, inasmuch as there was no underlying error (structural or otherwise). Thus, we turn to issue three — i.e., was the Kentucky court's determination that Railey's constitutional rights had not been violated contrary to clearly established Supreme Court precedent, an unreasonable application of clearly established Supreme Court precedent, or dependant on an unreasonable determination of the facts — and we find that we can quickly dispose of the third possibility. The only material facts are that Judge Bertram is Prosecutor Bertram's nephew, and Prosecutor Bertram participated in at least two of Railey's hearings, which were presided over by Judge Bertram. These facts are not in dispute and we can conclude without hesitation that the Kentucky court made no "unreasonable determination"

---

[2] Note that Railey has not raised any *legal* defect in the Kentucky court's determination of waiver, such as whether it was knowing, intelligent, or voluntary. Railey contends unequivocally that there *was no waiver*.

of these facts. The legal questions, however, are another matter entirely and resolution of those two questions (contrary-to and unreasonable-application-of) will require a comprehensive analysis.

### 1. Clearly Established Supreme Court Precedent

This much is clear: due process demands that the judge be unbiased. *In re Murchison*, 349 U.S. 133, 136 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of *actual* bias in the trial of cases." (emphasis added)). Furthermore, a judge can and should be disqualified for "bias, [] a likelihood of bias[,] or [even] an appearance of bias." *See Ungar v. Sarafite*, 376 U.S. 575, 588 (1964); *see also Murchison*, 349 U.S. at 136 ("[O]ur system of law has always endeavored to prevent even the probability of unfairness."); *accord Anderson v. Sheppard*, 856 F.2d 741, 746 (6th Cir. 1988) (opining that due process "require[s] not only an absence of actual bias, but an absence of even the appearance of judicial bias").

But, it is also clear that judicial disqualification based on a likelihood or an appearance of bias is not always of *constitutional* significance; indeed, "most matters relating to judicial disqualification d[o] not rise to a constitutional level." *Fed. Trade Comm'n v. Cement Inst.*, 333 U.S. 683, 702 (1948) (citing *Tumey v. Ohio*, 273 U.S. 510, 523 (1927) ("All questions of judicial qualification may not involve constitutional validity.")); *see also Bracy v. Gramley*, 520 U.S. 899, 904 (1997) ("Of course, most questions concerning a judge's qualifications to hear a case are not constitutional ones, because the Due Process Clause . . . establishes a constitutional floor, not a uniform standard. Instead, these questions are, in most cases, answered by common law, statute, or the professional standards of the bench and bar."). In only two types of cases has the Supreme Court actually held that something less than actual bias violates constitutional due process — (1) those cases in which the judge "has a direct, personal, substantial pecuniary interest in reaching a [particular] conclusion," *Tumey*, 273 U.S. 523 (subsequently expanded to include even indirect pecuniary interest); and (2) certain contempt cases, such as those in which the "judge becomes personally embroiled with the contemnor," *Murchison*, 349 U.S. at 141 (subsequently clarified to involve cases in which the judge suffers a severe personal insult or attack from the contemnor).[3]

The Court has also acknowledged four types of cases that, although they present prudent grounds for disqualification as a matter of common sense, ethics, or "legislative discretion," generally do *not* rise to a *constitutional* level — "matters of [1] kinship, [2] personal bias, [3] state policy, [and] [4] remoteness of interest." *Tumey*, 273 U.S. 523; *accord Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 820 (1986). But, in the 81 years since *Tumey*, the Court has yet to expound upon this general statement regarding the presumptive constitutional indifference to these types of issues.

The case at hand involves a matter of kinship between the judge and prosecutor — nephew and uncle, respectively — and the scenario is one of *likely* or *apparent* bias, inasmuch as Railey has offered no evidence of, or even an allegation of, any *actual* bias. Importantly, the pressing question is *not* whether the likelihood or appearance of bias stemming from this kinship violates due process.

---

[3] In *Withrow v. Larkin*, 421 U.S. 35 (1975), the Court acknowledged, by way of example, the two types of cases in which it had already established an unacceptable "probability" of actual bias, stating:

> Not only is a biased decision-maker constitutionally unacceptable but our system of law has always endeavored to prevent even the *probability* of unfairness. In pursuit of this end, various situations have been identified in which experience teaches that the *probability* of actual bias on the part of the judge or decision-maker is too high to be constitutionally tolerable. Among these cases are those in which [1] the adjudicator has a pecuniary interest in the outcome and [2] in which he has been the target of personal abuse or criticism from the party before him.

*Id*. at 47 (quotation marks, citations, and footnotes omitted); *see also N. Mariana Is. v. Kaipat*, 94 F.3d 574, 579-80 (9th Cir. 1996) (summarizing the cases in which the Supreme Court has employed the "possible temptation principle").

We need not decide that question at this time or on this record; for present purposes we can assume, without deciding, that this kinship violates due process, because, in the present context — review of a habeas petition brought under AEDPA — the question to be answered is confined to whether such a violation was "clearly established" by Supreme Court precedent. And, clearly, it was not.

### a. *Supreme Court Cases*

In *Tumey v. Ohio*, 273 U.S. at 514-15, the Supreme Court considered whether a village mayor, acting as a judge in mayor's court, violated a criminal defendant's constitutional right to due process by presiding over the case, on the theory that the mayor's pecuniary interest in convicting the defendant would bias the mayor in favor of conviction. The Court concluded that, despite the absence of any evidence of actual bias, this form of remuneration violated due process, explaining:

> It is finally argued that the evidence shows clearly that the defendant was guilty and that he was only fined $100 which was the minimum amount, and therefore that he cannot complain of a lack of due process, either in his conviction or in the amount of the judgment. The plea was not guilty and he was convicted. *No matter what the evidence was against him, he had the right to have an impartial judge.* He seasonably raised the objection, and was entitled to halt the trial because of the disqualification of the judge, which existed both because of his direct pecuniary interest in the outcome, and because of his official motive to convict and to graduate the fine to help the financial needs of the village. There were thus presented at the outset both features of the disqualification.

*Id.* at 535 (emphasis added). Consequently, the Court set forth the proposition that a system in which a judge receives pecuniary remuneration at the expense of the defendant — regardless of the judge's *actual* impartiality — necessarily renders the judge partial (or so "probably" partial as to create a presumption of actual partiality) and thereby deprives the defendant of due process.

In reaching this holding, Chief Justice Taft, writing for a unanimous Court, began by reciting the axiom "[t]hat officers acting in a judicial or quasi judicial capacity are disqualified by their interest in the controversy to be decided," but explained that "[n]ice questions, however, often arise as to what the degree or nature of the interest must be." *Id*. at 522. The Court then explained that not "all questions of judicial qualification . . . involve constitutional validity," and dispatched some issues by way of example. *Id*. at 523 (noting that "matters of kinship, personal bias, state policy, remoteness of interest would seem generally to be matters merely of legislative discretion"). "But," the Court exclaimed, "it certainly violates the Fourteenth Amendment and deprives a defendant in a criminal case of due process of law to subject his liberty or property to the judgment of a court, the judge of which has a direct, personal, substantial *pecuniary* interest in reaching a conclusion against him in his case." *Id*. (emphasis added). It is noteworthy that this limitation to *pecuniary* interest was not mere happenstance, but was the unremarkable acknowledgment of the common law. "At the time the American court system was established, the common law of disqualification 'was clear and simple: a judge was disqualified for direct pecuniary interest and for nothing else.'" *Del Vecchio v. Illinois Dept. of Corr.*, 31 F.3d 1363, 1372 (7th Cir. 1994) (quoting John Frank, Disqualification of Judges, 56 Yale L. J. 605, 609 (1947)). The question thus presented, and upon which the Court embarked in a rather lengthy analysis, was — *how much* pecuniary interest *was enough* so as not to be "properly ignored as within the maxim '*de minimis non curat lex*.'" *Tumey*, 273 U.S. at 531.

In answering this question, the Court created a test to measure the "possible temptation" inherent in a procedure by which a judge receives a financial benefit (pecuniary remuneration) as the result of one party's prevailing over the other (e.g., "a system by which [a] judge is paid for his service only when he convicts the defendant"). *Id*. at 531-32. The Court stated the test as:

> Every [such outcome-based-remuneration] procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear, and true between the state and the accused denies the latter due process of law.

*Id*. at 532; *see also Ward v. Village of Monroeville*, 409 U.S. 57, 60 (1972) (extending this result to a procedure by which the financial benefit was directed to the village, rather than the mayor personally, because "the mayor's executive responsibilities for village finances may make him partisan to maintain the high level of contribution from the mayor's court"); *Connally v. Georgia*, 429 U.S. 245, 246 (1977) (applying the *Tumey* "possible temptation test" to find an unconstitutional likelihood of bias in a procedure by which a justice of the peace was paid $5 for each search warrant issued, but no fee if the request for a warrant was denied); *Gibson v. Berryhill*, 411 U.S. 564, 579 (1973) (finding an unconstitutional likelihood of bias in the operation of an administrative licensing board, whose members benefitted financially from the outcome of their decisions). *But see Dugan v. Ohio*, 277 U.S. 61, 65 (1928) (finding insufficient likelihood of bias, and no due process violation, in the operation of a mayor's court in which the mayor-judge was not compensated from the fines imposed and had no executive responsibility for assuring the village had sufficient finances).

In *Murchison*, 349 U.S. at 135, the Supreme Court considered whether a "trial before the judge who was at the same time the complainant, indicter and prosecutor, constituted a denial of the fair and impartial trial required by the Due Process Clause." Justice Black, writing for the majority, began by reciting the axiom that due process requires an absence of "actual bias," but acknowledged some ambiguity in defining the "interest" that creates likely or apparent bias, and invoked the possible-temptation test to resolve the ambiguity, thereby extending the possible-temptation test to the first (and, as of yet, only) type of circumstances other than pecuniary remuneration:

> A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the *probability* of unfairness. To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome.
>
> That interest cannot be defined with precision. Circumstances and relationships must be considered.
>
> This Court has said, however, that [e]very procedure which would offer a *possible temptation* to the average man as a judge not to hold the balance nice, clear, and true between the State and the accused denies the latter due process of law. Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way justice must satisfy the appearance of justice.

*Id*. (quotation marks and editorial marks omitted; emphasis and paragraph breaks added) (citing *Tumey*, 273 U.S. at 532, and *Offutt v. United States*, 348 U.S. 11, 14 (1954)). Thus, the Court framed the question as whether, as a matter of law, a judge sitting as a single-person grand jury holds such a personal "interest" in obtaining a conviction on a contempt charge that the ensuing proceeding is inherently biased. In finding inherent bias, the Court reasoned, generally:

> Having been a part of that [accusatory] process a judge cannot be, in the very nature of things, wholly disinterested in the conviction or acquittal of those accused. While he would not likely have all the zeal of a prosecutor, it can certainly not be said that

he would have none of that zeal. Fair trials are too important a part of our free society to let prosecuting judges be trial judges of the charges they prefer.

. . . .

As a practical matter it is difficult if not impossible for a judge to free himself from the influence of what took place in his 'grand-jury' secret session [i.e., the impetus for the contempt charge at issue]. His recollection of that [incident] is likely to weigh far more heavily with him than any testimony given in the open hearings.

*Id*. at 137-38 (footnotes omitted). The Court also reasoned, *specifically*:

This incident also shows that th[is] judge was doubtless more familiar with the facts and circumstances in which the charges were rooted than was any other witness. There were no public witnesses upon whom petitioners could call to give disinterested testimony concerning what took place in the secret chambers of the judge. If there had been they might have been able to refute the judge's statement about [the contemnor's] insolence. Moreover, as shown by the judge's statement here[,] a 'judge-grand jury' might himself many times be a very material witness in a later trial for contempt. If the Charge should be heard before that judge, the result would be either that the defendant must be deprived of examining or cross-examining him or else there would be the spectacle of the trial judge presenting testimony upon which he must finally pass in determining the guilt or innocence of the defendant. In either event the State would have the benefit of the judge's personal knowledge while the accused would be denied an effective opportunity to cross-examine. The right of a defendant to examine and cross-examine witnesses is too essential to a fair trial to have that right jeopardized in such way.

*Id*. (footnote omitted). Thus, the general proposition of *Murchison* is that a proceeding in which the presiding judge is also "the complainant, indicter[,] prosecutor," and star witness, *id*. at 135, is inherently biased, despite the absence of any evidence of actual bias. *Id*. at 137; *see also id*. at 140 (Reed, J., dissenting) ("It is neither shown nor alleged that the state judge was in any way biased. Nor is this required by the Court, for it holds, as a matter of law, that the judge's 'interest' in a conviction makes the proceedings inherently prejudicial and thus constitutionally invalid."). Of course, the specific holding was not as broad as this general proposition, inasmuch as the Court relied on the specifics of the particular proceedings to demonstrate violations of the defendant's constitutional rights beyond the judge's potential bias, such as the defendant's right to a public trial, to cross-examine the witnesses against him, and to call witnesses in his defense. *See also Ungar*, 376 U.S. at 576 (refusing to extend *Murchison* to ordinary contempt proceedings, upon a refusal to "assume that judges are so irascible and sensitive that they cannot fairly and impartially deal with resistance to their authority"); *Taylor v. Hayes*, 418 U.S. 488, 501 (1974) (applying the possible-temptation test to contemptuous conduct and finding an unconstitutional likelihood of bias).

In *Aetna v. Lavoie*, 475 U.S. at 813, the Supreme Court considered whether a Justice of the Alabama Supreme Court, Justice T. Eric Embry,[4] had violated the defendant insurance company's (i.e., Aetna's) right to due process by hearing its appeal (and, indeed, casting the deciding vote against Aetna and authoring the *per curiam* opinion, which made punitive damages available in bad-faith-refusal-to-pay claims against insurers) when, all the while, Justice Embry was himself a plaintiff against another insurer, with a bad-faith-refusal-to-pay claim pending in an Alabama court.

---

[4] Earlier in life, Embry had received notoriety as the trial lawyer who represented the New York Times in what ultimately became the landmark case of *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964).

On review, Chief Justice Burger, writing for the five-member majority, addressed the merits in four separate sections of the opinion, though only the first two sections are pertinent here.

In the first section, the Court addressed Aetna's argument that "Justice Embry's general hostility [i.e., bias] towards insurance companies" created an unconstitutional likelihood or appearance of bias. *Id*. at 820. The Court began its analysis by "recogniz[ing] that not all questions of judicial qualification involve constitutional validity," specifically quoting *Tumey*'s admonition that "matters of kinship, personal bias, state policy, [and] remoteness of interest, would seem generally to be matters merely of legislative discretion." *Id*. at 820 (quotation marks, citations, and editorial marks omitted). Thus, the Court acknowledged the question but declined to "decide whether allegations of bias or prejudice by a judge of the type we have here would ever be sufficient under the Due Process Clause to force recusal." *Id*. at 821. Despite declining to decide, however, the Court reiterated that "only in the most extreme of cases would disqualification on this basis be constitutionally required, [that] appellant's arguments here fall well below that level . . . . [and, therefore,] [Aetna]'s allegations of bias and prejudice on this general [likelihood- or appearance-of-bias] basis [] are insufficient to establish any constitutional violation." *Id*. It is noteworthy that the Court referenced kinship in this portion of the analysis, but it is far more significant that the Court omitted from this portion of its analysis any reference to the possible-temptation test.

In the second section, the Court addressed Aetna's argument that Justice Embry had "a direct, personal, substantial, pecuniary interest in reaching a conclusion against [Aetna]." *Id*. at 821-22 (quoting *Tumey*, 273 U.S. at 523). The Court applied the possible-temptation test; recounted several facts suggesting "a possible temptation to the average judge [that would] lead him not to hold the balance nice, clear[,] and true"; and concluded that "Justice Embry's opinion for the Alabama Supreme Court had the clear and immediate effect of enhancing both the legal status and the settlement value of his own case." *Id*. at 822-24 (citations and editorial marks omitted). The Court was explicit in the limited scope of its holding: "We hold simply that when Justice Embry made that judgment, he acted as a judge in his own case. We also hold that his interest was direct, personal, substantial, and pecuniary." *Id*. at 824 (quotation marks, editorial marks, and paragraph break omitted) (citing *Murchison*, 349 U.S. at 136; *Ward*, 409 U.S. at 60; *Tumey*, 273 U.S. at 523). Thus, when read in concert, these two sections of the *Aetna* opinion offer no support for — and even appear to refute — the proposition that the possible-temptation test applies to likelihood- or appearance-of-bias issues generally, rather than to only pecuniary interest.[5] *See Linney v. Turpen*, 49 Cal. Rptr. 2d 813, 821 n.10 (Cal. Ct. App. 1996) (refusing to apply the possible-temptation test to issues other than pecuniary interest, because *Tumey* and *Ward* "clearly mean that the 'possible temptation' mentioned *occurs when* there is a direct, personal, substantial, pecuniary interest").

In *Bracy v. Gramley*, 520 U.S. at 901, the Supreme Court considered a pre-AEDPA habeas petitioner's assertion that he had demonstrated "'good cause,' as required by Habeas Corpus Rule 6(a), for discovery on his claim of actual judicial bias in his case," based on his argument that the judge, who was proven to have taken bribes in other cases, was probably (and apparently) biased against him (a non-bribing defendant), because the judge "had an interest in a conviction [in his case, in order] to deflect suspicion that he was taking bribes in other cases."[6] Before the case

---

[5] *Aetna* did not involve a contempt proceeding and the Court did not speak to that issue, but it is evident — based on the favorable citations to *Murchison* and *Ward* — that the possible-temptation test continues to apply to contempt proceedings, despite the construction of the opinion itself, which can be read as limiting the test to pecuniary interests.

[6] The Seventh Circuit described the theory as follows: "There is no suggestion that Bracy and Collins bribed or offered to bribe him. The argument rather is that Judge Maloney came down hard on criminal defendants in cases in which he was not bribed, to avoid suspicion that he was on the take, to cancel any bad impression that his acquittals might make on the voters — maybe even to make defendants desperate to bribe him, fearing he would punish them with

reached the Supreme Court, the Seventh Circuit Court of Appeals had considered Bracy's claims, concluding:

> [This] is a case in which there is merely an *appearance of impropriety* in the judge's presiding, *and an appearance of impropriety does not constitute a denial of due process*. Appearance of impropriety there was. We know this because if a judge were under indictment for accepting bribes he would not be permitted to hear any cases. [And] without more [than an appearance of impropriety] a defendant's conviction cannot be set aside. [But t]he petitioners also seek discovery, so that they can try to find out whether there was *actual bias* by Judge Maloney at their trial . . . . Even if the expedition discovered that Maloney did lean over backwards in favor of the prosecution in cases in which he was not bribed, in order to conceal his taking of bribes in other cases, it would not show that he followed the practice in this case.

*Bracy v. Gramley*, 81 F.3d 684, 690 (7th Cir. 1996), *overruled by* 520 U.S. 899 (1997) (citations and paragraph break omitted; emphasis added); *but see id*. at 699-703 (Rovner, J., dissenting) (arguing that, under the particular facts of the case, an appearance of impropriety was enough).

The Supreme Court "granted certiorari to address whether . . . [Bracy] should have been granted discovery under Habeas Corpus Rule 6(a) to support his [actual] judicial-bias claim." *Id*. at 903. Notably, the Court did not grant certiorari on the question of whether an appearance of impropriety was enough to violate due process. Chief Justice Rehnquist, writing for a unanimous Court, began by expressly acknowledged the Seventh Circuit's findings:

> The [Seventh Circuit] court conceded the 'appearance of impropriety' in petitioner's case but reasoned that this appearance did not require a new trial because it provided only a weak basis for supposing the original trial an unreliable test of the issues presented for decision in it. Next, the court agreed that petitioner's theory — that Maloney's corruption permeated his judicial conduct — was plausible, but found it not sufficiently compelling an empirical proposition to justify presuming actual judicial bias in petitioner's case. Finally, the court held that petitioner had not shown good cause for discovery to prove his claim, as required by 28 U.S.C. § 2254, Rule 6(a). This was because, in the court's view, even if petitioner were to uncover evidence that Maloney sometimes came down hard on defendants who did not bribe him, it would not show that he followed the practice in this case. In any event, the court added, because petitioner had failed to uncover any evidence of actual bias without discovery, the probability is slight that a program of depositions aimed at crooks and their accomplices will yield such evidence.

*Bracy*, 520 U.S. at 903 (citations, editorial marks, and certain quotation marks omitted). The Court also acknowledged the Circuit Court dissent, albeit in a footnote, and implicitly denied the dissenting judge's proposition that a mere appearance of impropriety was sufficient to violate due process, by noting that such a view would have rendered irrelevant the question then before the Court:

---

adverse rulings if they did not. There is no evidence, but only conjecture, that Maloney actually did lean over backwards in favor of the prosecution in this or any other case in which he was not bribed; did, that is, rule against the defense only because he was taking bribes in other cases. Collins argues that evidence is unnecessary, and Bracy that if it is necessary their request for discovery should have been granted." *Bracy v. Gramley*, 81 F.3d 684, 688 (7th Cir. 1996).

> The dissenting judge insisted that petitioner had shown 'good cause' for discovery to support his judicial-bias claim and went on to state that, in her view, *petitioner was entitled to relief whether or not he could prove that Maloney's corruption had any impact on his trial* [i.e., actual bias]. *The latter conclusion, of course, would render irrelevant the discovery-related question presented in this case.*

*Id.* at 903 n.4 (emphasis added). Since the Court does not engage in advisory opinions or the resolution of irrelevant questions, it would not be unreasonable to conclude from this statement that the mere appearance of impropriety is not enough to violate due process. Of course this somewhat vague statement, relegated to a footnote, is far from a holding and may not have been intended to support such a conclusion. Regardless, it is noteworthy that the Court did not resolve the appeal on the issue of an appearance of impropriety, nor did it anywhere mention the possible-temptation test.

The Court began its analysis with the oft-repeated maxim that "most questions concerning a judge's qualifications to hear a case are not constitutional ones, because the Due Process Clause . . . establishes a constitutional floor, not a uniform standard," and defined that minimum threshold by explaining that "the floor established by the Due Process Clause clearly requires a fair trial in a fair tribunal, before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Id.* at 904-05 (citing *Aetna*, 475 U.S. at 821-22, and *Tumey*, 273 U.S. at 523). And, rather than broadening the possible-temptation test, the Court appeared to ignore it, announcing that "if [bias] could be proved, . . . in [Bracy's] own case [it] would violate the Due Process Clause." *Id.* The Court then concluded that Bracy had shown sufficient evidence — foremost being Judge Maloney's thorough corruption — to satisfy "good cause" to conduct discovery. *Id.* at 909.[7]

In sum, one *could* read the Supreme Court precedent in this area as holding that the probability of bias — based on a likelihood or appearance of bias — can be sufficient to disqualify a judge and violate a party's constitutional right to due process. But, one *could also* read these cases as holding that, other than in cases of contempt arising in a closed (secret) hearing, only actual bias or pecuniary-interest-based probability is sufficient — and, moreover, that a matter of mere kinship has, as of yet, never been acknowledged as a sufficiently biasing interest. Regardless of the preferred reading — or the merits of one reading over the other — the fact that there are two or more reasonable readings compels the conclusion that this precedent is not "clearly established."

### b. Circuit Court Interpretation

Although decisions from our sister circuits do not provide precedent for our AEDPA review, they do offer insight into what was "clearly established" at the time the state court rendered its decision. Thus, the following brief review of pertinent cases, arranged chronologically to differentiate those cases filed before the decision on Railey's post-conviction motion in October 2004 from those filed afterwards, is included, if only to further inform our analysis.

---

[7] After the Supreme Court reversed and remanded on the basis that Bracy had made a sufficient showing of good cause, the Court also remanded co-defendant Collins's case. "On remand, the district court denied habeas relief as to the defendants' convictions, but granted relief as to their sentencing. A majority of the [*en banc*] Seventh Circuit affirmed, holding that the defendants were entitled to a new sentencing hearing in order to determine whether the death penalty should be imposed. On January 10, 2003, then-Governor Ryan entered clemency orders in favor of the defendants which read, in pertinent part: 'Sentence Commuted to a Sentence Other Than Death for the Crime of Murder, So that the Maximum Sentence that may be Imposed is Natural Life Imprisonment Without the Possibility of Parole or Mandatory Supervised Relief.' Upon remand from the Seventh Circuit, and following former Governor Ryan's clemency orders, the circuit court entered an order remanding the defendants to the Department of Corrections 'to serve natural life sentences as per Governor George Ryan's order.'" *Illinois v. Collins*, 815 N.E.2d 860, 861-62 (Ill. App. 2004).

### i. Pre-October-2004 Circuit Court Cases

In *Brown v. Vance*, 637 F.2d 272, 274 (5th Cir. 1981), the Fifth Circuit considered Mississippi's system for paying judges, under which judges were paid based on the number of cases they heard, and plaintiffs (including prosecutors) were able to choose which judge would hear the case, thereby creating a temptation for judges to depart from judicial neutrality. In reaching its conclusion that the fee system was "in violation of the due process clause under the *Tumey-Ward* test," *id*. at 283, the court felt compelled to distinguish *Withrow v. Larkin*, 421 U.S. 35, 47 (1975), a case in which the Supreme Court had found insufficient bias — and no due process violation — in an agency's conduct of serving both investigative and adjudicative roles, because the plaintiff had failed to "overcome a presumption of honesty and integrity in those serving as adjudicators."

The Fifth Circuit distinguished *Withrow* from *Tumey*, *Ward*, and *Berryhill* on the basis of pecuniary interest, stating simply: "There was no question of the members of the board [in *Withrow*] profiting personally from [their] decision[s]." *Brown*, 637 F.2d at 283. The court continued:

> In [*Tumey*, *Ward*, and *Berryhill*], the Supreme Court was fully aware that a presumption of probity attached to adjudicators but it was concerned over the 'possible temptation to the average man' of yielding to the *expectation of personal gain* by abandoning neutrality. . . . In *Tumey* and *Ward*[,] the Supreme Court, as we read the opinions in those cases, was not as interested in the probity of an individual judge or perhaps even, of the great majority of judges. It was interested rather in the inherent defect in the legislative framework arising from the vulnerability of the average man — as the system works in practice and as it appears to defendants and to the public. The Court's inquiry there and our inquiry here is not whether a particular man has succumbed to temptation, but *whether the economic realities make the design of the fee system vulnerable to a 'possible temptation' to the 'average man 'as judge*. Here we have no need to be solicitous of the honor of a particular judge; none has been questioned. Nor do concerns of judicial administration necessarily require a high evidentiary barrier. The *Tumey-Ward* test, in sum, is leveled at the system, not the individual judge. This is the reason it speaks of temptation to the average man. The 'average man as judge' concept was made the heart of the test to introduce a humble Everyman, prey to the vicissitudes of life, the need for bread on the table, and for small favors from the right people.

*Id*. at 284 (quotation marks, citations, and paragraph break omitted; emphasis added). The court found the financial temptation in question sufficient to create probable bias and violate due process.

In *Dyas v. Lockhart*, 705 F.2d 993, 995 (8th Cir. 1983), the Eighth Circuit considered Dyas's habeas claim that "he was denied his due process right to a fair trial" because the presiding judge was "the uncle of the Prosecuting Attorney and the brother and father of the two Deputy Prosecuting Attorneys who participated in the prosecution." The court considered the claim in two parts: first, whether Dyas had waived disqualification; and second, whether the judge "is conclusively presumed to be biased[,] given his relationship to the Prosecuting Attorney; [such that Dyas] need not demonstrate [] actual bias or actual prejudice" *Id*. at 996. As to the latter, the court reasoned:

> Generally, a habeas petitioner seeking reversal of his conviction on due process grounds because of the trial judge's alleged bias must demonstrate that the judge was actually biased or prejudiced against the petitioner. However, as the Supreme Court has recognized, not only is a biased decision-maker constitutionally unacceptable but our system of law has always endeavored to prevent even the probability of unfairness. Accordingly, there are cases where experience teaches that the probability of actual prejudice on the part of the judge or decision-maker is too high

to be constitutionally tolerable. For example, experience teaches that the probability of actual bias is too high where the judge has a pecuniary interest in the outcome of a trial or where the judge has been the target of personal abuse or criticism from the party before him. The test in determining if a judge's bias should be presumed in a particular case is whether, realistically considering psychological tendencies and human weaknesses, the judge would be unable to hold the proper balance between the state and the accused. In making this inquiry we, of course, presume the honesty and integrity of those serving as judges.

*Id*. at 996-97 (citing *Tumey*, *Murchison*, *Ward*, and *Withrow*) (citations, quotation marks and footnotes omitted). Furthermore, "a trial judge's disqualification under the Code of Judicial Conduct does not necessarily imply impermissible bias under the due process clause." *Id*. at 997.

The Eighth Circuit concluded that the presiding judge's "relationship to the Prosecuting Attorneys was, standing alone, insufficient to raise the conclusive presumption of his actual bias." *Id*. The presiding judge "had no personal interest in the outcome of the case other than fairly trying and submitting the issues to the jury . . . . Furthermore, the relationship here does not necessarily suggest that [the presiding judge] had such a strong personal or financial interest in the outcome of the trial that he was unable to hold the proper balance between the state and the accused." *Id*.

In *Anderson v. Sheppard*, 856 F.3d 741, 745 (6th Cir. 1988), we considered an employment-discrimination plaintiff-appellant's claim on direct appeal that he had been denied a fair trial because of judicial bias, premised on the presiding judge's open hostility towards him. Relying on our interpretation of Supreme Court precedent, we opined that due process "require[s] not only an absence of actual bias, but an absence of even the appearance of judicial bias," and reasoned that "[a]lthough there is no mechanical test for determining when bias and/or hostility exists, when a trial judge exhibits the open hostility and bias at the beginning of a judicial proceeding as was exhibited here, it follows that the judgment entered therein must be reversed." *Id*. at 746-47 (citing *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 172 n.19 (1951)). Because we found that the trial judge had exhibited actual bias, we were not presented with a question of probable, potential, or apparent interest, and we were not called upon to apply the possible-temptation test.

In *Del Vecchio v. Ill. Dept. of Corr.*, 31 F.3d 1363, 1369-70 (7th Cir. 1994) (en banc), the Seventh Circuit considered Del Vecchio's habeas claim that he had been denied a fair trial because the presiding judge in his murder trial, Judge Louis Garippo, had been a prosecutor who participated in Del Vecchio's prior murder conviction 14 years earlier (in 1965), which created an appearance of bias "because of some personal responsibility Judge Garippo felt for Del Vecchio's light sentence for the 1965 murder." In addressing this claim, the *en banc* majority reasoned:

The dissents treat the Supreme Court's 'appearance of justice' language from *Murchison* and *Aetna* as holding that the due process clause requires judges to recuse themselves based solely on appearances. But those cases present no such holding; the Supreme Court's mention of 'appearance of justice' certainly does not compel reversal on due process grounds if a federal judge decides — based on a personal view of judicial protocol — that it looked bad for a state judge to try a case. *Such a pure appearance approach would be hard to reconcile with the bevy of Supreme Court precedents on the issue of recusal which do not address the 'appearance of justice.'* Appearances are usually for the eyes of the beholder. Years after whatever appearance there was has disappeared, a reviewing judge is left not with appearance but with hindsight speculation. That will not suffice as a basis for overturning a conviction. *The Supreme Court has never rested the vaunted principle of due process on something as subjective and transitory as appearance.* Instead, the Supreme Court simply uses the 'appearance of justice' language to make the point

that judges sometimes must recuse themselves when they face possible temptations to be biased, even when they exhibit no actual bias against a party or a cause.

. . .

Moreover, even if Judge Garippo faced some 'possible temptation' to be biased against Del Vecchio, not every 'possible temptation' to be biased presents a sufficient possibility of bias to require disqualification. This is evident from other language in the same cases in which the Court talks about 'possible temptations.' Thus, in *Aetna* and *Tumey*, the *Court noted that not all questions of judicial qualification involve constitutional validity.* Matters of kinship, personal bias, state policy, [and] remoteness of interest, would generally be matters of legislative discretion — *even though any of these matters,* particularly kinship and personal bias, *could offer a 'possible temptation' to be biased.* At some point, a biasing influence will be too remote and insubstantial to violate the constitutional constraints.

*Id.* at 1371-72 (citations, editorial marks, and footnote omitted; emphasis added). Based on this reasoning, the Seventh Circuit concluded that "[d]isqualification is required only when the biasing influence is . . . so strong that we may presume actual bias [and] . . . [j]udged by this standard, Judge Garippo was not required to disqualify himself." *Id.* at 1375.

In *Jones v. Luebbers*, 359 F.3d 1005, 1008-09 (8th Cir. 2004), the Eighth Circuit considered Jones's AEDPA habeas petition, in which Jones claimed that he had been denied a fair trial because of judicial bias, premised on the presiding judge's preexisting and ongoing animosity toward the public defender. The Eighth Circuit began its analysis by editorializing about the possible-temptation test (i.e., standard), proclaiming that "clearly established Federal law, as determined by the Supreme Court of the United States, recognizes not only actual bias, but also the appearance of bias, as grounds for disqualification," but, "[a]lthough clearly established, this standard is inherently vague." *Id.* at 1012 (citation, quotation marks, and editorial marks omitted). "Application of this vague [possible-temptation] standard, when viewed through the deferential lens of *Williams v. Taylor* and the AEDPA, necessarily leaves state courts considerable latitude to pronounce rulings that do not contradict, and are reasonable applications of, *Murchison* and *Tumey*." *Id.* at 1012-13.

The Eighth Circuit acknowledged that application of the possible-temptation test is "simple" when "a judge's interest in the outcome of a case is pecuniary," or in the context of "contemptuous behavior in closed proceedings," but "application of the rule is not as simple where the alleged bias is personal and the case involves no closed proceedings or alleged procedural infirmities." *Id.* at 1013. "In such cases," the court explained — emphasizing the objective nature of the test — the test "require[s] disqualification [only if] the potential for bias is sufficiently great to tempt an average man serving as a judge to stray from impartiality." *Id.* "In applying this test, the [Supreme] Court explained that we are not to hold judges to a superhuman standard that would allow no expressions of emotion, and that we are to presume the ability of judges to rule impartially notwithstanding personal attacks and challenges to their authority." *Id.* Thus, the Eighth Circuit concluded that, despite the obvious animosity between the judge and the public defender, the apparent bias had not violated due process, explaining: "Upon reviewing the instances of hostility identified by Jones, we do not believe [that the judge]'s demeanor was wholly unjustified nor do we believe that [his] reactions exceeded that which imperfect men and women, even after having been confirmed as judges, sometimes display." *Id.* at 1014-15 (citations and quotation marks omitted).

In *Johnson v. Carroll*, 369 F.3d 253, 254 (3d Cir. 2004), the Third Circuit considered Johnson's AEDPA habeas petition, in which Johnson claimed that he had been denied a fair sentencing hearing because an *ex parte* sentencing recommendation had biased the presiding judge.

That is, in an unrelated proceeding in 1981, a state prosecutor named James Liguori had prosecuted Johnson and obtained a conviction. *Id.* Johnson sent Liguori a Christmas card from prison, in which he had written a vague but menacing note. *Id.* at 255. When Johnson escaped from prison, the incident made the local news, prompting some concern for Liguori and his family. *Id.* The case at issue — stemming from Johnson's 1997 kidnapping of his estranged 16-year-old daughter — was tried in 1999 and the jury convicted Johnson on multiple counts. *Id.* Prior to sentencing, the presiding judge happened upon Liguori at a social function, and "Liguori commented that Johnson was a 'bad guy,' that he had 'threatened' Liguori and his family, and that Liguori 'wanted to see that justice was done.'" *Id.* The presiding judge reported this *ex parte* communication to the parties, and Johnson's counsel "assured the judge that Johnson's 1981 Christmas card was part of the public record," and that she had no intention of filing a motion for recusal or disqualification. *Id.* at 256.

After his conviction was affirmed by the Delaware Supreme Court, Johnson sought habeas relief in federal court. *Id.* The district court agreed with Johnson that the *ex parte* communication created an appearance of bias and that the trial judge's failure to recuse himself *sua sponte* resulted in a violation of Johnson's due process rights. *Id.* at 256-57. The government appealed on the theory that the district court had failed to apply the AEDPA standard of review. On appeal, the Third Circuit began its analysis by confining Johnson's claim: "Johnson has not asserted, and there is no evidence, that the trial judge harbored any *actual* bias toward him; [but only] that the *ex parte* communication created an appearance of bias and that the appearance of bias violated his due process rights []." *Id.* at 258-59. The court continued by framing the issue as follows:

> Under the plain language of § 2254(d), as well as the United States Supreme Court's case law, we are presented only with one narrow issue: whether the Supreme Court has ever held in any of its decisions existing at the time of the District Court's judgment, including the three cases relied on by Johnson and the District Court, that an appearance of bias on the part of a state court judge, without more, violates the Due Process Clause of the United States Constitution. We are not, and cannot be, concerned with the issues of whether the trial judge should have recused himself *sua sponte* or whether the *ex parte* communication at issue was sufficient to constitute an appearance of bias. We assume that there was an appearance of bias.

*Id.* at 259. Having thus framed the issue, the Third Circuit explained in some detail, and ultimately concluded, that "the Supreme Court's case law has not held, not even in dicta, let alone 'clearly established,' that the mere appearance of bias on the part of a state trial judge, without more, violates the Due Process Clause, [and therefore,] the District Court's judgment based on that erroneous view must be reversed under AEDPA." *Id.* at 263. *See also United States v. Couch*, 896 F.2d 78, 81 (5th Cir. 1990) (observing that 28 U.S.C. § 455 "and the Due Process Clause are not coterminous"); *Hardy v. United States*, 878 F.2d 94, 97 (2d Cir. 1989) (concluding similarly that § 455(a)'s "appearance of impropriety standard" is not "mandated by the Due Process Clause").

### ii. Post-October-2004 Circuit Court Cases

In *Crater v. Galaza*, 491 F.3d 1119, 1130 (9th Cir. 2007), the Ninth Circuit considered Crater's AEDPA habeas petition, in which Crater claimed that he had been denied a fair trial because of "an impermissible appearance of [judicial] bias," which was premised on the presiding judge's pre-trial, *in camera* statements recommending to Crater, in no uncertain terms, that he accept the government's plea offer. The Ninth Circuit began its analysis by announcing that "Supreme Court precedent reveals only three circumstances in which an appearance of bias — as opposed to evidence of actual bias — necessitates recusal": (1) a judge who "has a direct, personal, substantial pecuniary interest in reaching a conclusion against one of the litigants," *id.* at 1131 (citing *Tumey*, *Ward*, and *Aetna*) (editorial marks omitted); (2) a judge who "becomes embroiled in a running, bitter controversy with one of the litigants," *id.* (quoting *Mayberry v. Pennsylvania*, 400 U.S. 455, 465

(1971)) (quotation marks omitted); and (3) a judge who "acts as part of the accusatory process," *id*. (quoting *Murchison*) (quotation marks omitted). The Ninth Circuit then determined that "[n]one of the three [established] circumstances requiring recusal reflects the case at bar," and concluded that the state court's "conclusion that the law did not compel disqualification for presumed judicial bias accords with clearly established Federal law, as determined by the Supreme Court of the United States." *Id*. at 1132 (citations, quotation marks, and editorial marks omitted).

In *Davis v. Jones*, 506 F.3d 1325, 1326 (11th Cir. 2007), the Eleventh Circuit considered Davis's AEDPA habeas petition, in which Davis claimed that he had been denied due process because the juvenile-court judge who presided over his preliminary proceedings — including the proceeding to transfer him to the circuit court to be tried as an adult — was the brother to one of the three prosecutors at those proceedings. Davis did not claim that he was unaware of the relationship, *id*. at 1327 n.2, did not move to disqualify the judge, *id*. at 1327, and did not allege any actual bias, *id*. at 1326. "Rather, Davis contends that the relationship between [judge and prosecutor] created an appearance of partiality and violated his federal constitutional due process rights . . . ." *Id*.

The Eleventh Circuit framed the issue by first acknowledging that federal recusal statute and federal canons of judicial ethics are inapposite because they do not govern state court judges; that the state court's application of state law is not subject to review on habeas; and that "habeas review here narrowly concerns only the Due Process Clause and whether the [state court's] rejection of Davis's federal constitutional due process claim constituted an 'unreasonable application' of clearly established federal law as determined by the Supreme Court's precedent." *Id*. at 1332-33. Having thus framed the issue, the Eleventh Circuit explained in some detail, and ultimately concluded, that "[t]here is simply no Supreme Court holding establishing that the type of appearance problem alleged here violates the Due Process Clause or that Davis lacked an impartial tribunal." *Id*. at 1336.

### iii. Recap of Circuit Court Cases

The theme of these Circuit Court cases is that the Supreme Court has set out only two (perhaps three), very specific, situations in which something less than actual bias — that being a significant probability of bias — is sufficient to violate a party's constitutional right to due process. No case has held — or, more importantly, found the Supreme Court to have held — that mere appearance of bias is sufficient without something more. And no case has ever applied the possible-temptation test to find a sufficiently biasing interest resulting from mere kinship. Quite to the contrary, two circuit courts have held that mere kinship, without something more, is insufficient under the prevailing Supreme Court precedent. *See Davis*, 506 F.3d at 1325 (judge and prosector were brothers); *Dyas*, 705 F.2d at 993 (judge and prosecutor were uncle and nephew, respectively).

### 2. *Contrary-to or Unreasonable-Application-of Supreme Court Precedent*

Railey contends that Judge Bertram was obligated — based on the Supreme Court's possible-temptation test — to recuse himself *sua sponte*, due to his familial relationship with Prosecutor Bertram, and that his failure to do so violated Railey's right to due process. As demonstrated in the preceding sections, such an application of the possible-temptation test is not "clearly established," but is instead best characterized as *arguable*. This determination effectively ends the analysis.

But, even assuming that Railey's formulation was "clearly established," the question would remain as to whether the Kentucky court's decision was "contrary to" or an "unreasonable application of" that formulation. The answer is again no, but a brief explanation may be beneficial.

The phrase "contrary to federal law" means that the state court "arrive[d] at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "decide[d] a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). Furthermore, "clearly established law as determined by [the

Supreme] Court refers to the holdings, as opposed to the dicta, of th[e] Court's decisions as of the time of the relevant state-court decision." *Yarborough v. Alvarado*, 541 U.S. 652, 660-61 (2004) (citation and quotation marks omitted). We have explained that "[a] state-court decision is considered contrary to clearly established Federal law if it is diametrically different, opposite in character or nature, or mutually opposed." *Benge v. Johnson*, 474 F.3d 236, 241 (6th Cir. 2007) (quotation marks and editorial marks omitted) (quoting *Williams*, 529 U.S. at 405).

Because the Supreme Court has never ruled on this particular question of law (other than in the "matters of kinship" dicta) and has never decided a case on a materially indistinguishable set of facts, this "contrary to" aspect of the AEDPA test cannot apply. The Kentucky court's decision — essentially finding no structural error, which is the kind of error that would flow from a judicial-bias-based due process violation — is simply not "diametrically different, opposite in character or nature, or mutually opposed," *see Benge*, 474 F.3d at 241, to any existing Supreme Court case. Therefore, the present decision is not "contrary to" any existing Supreme Court precedent.

The phrase "unreasonable application of" Supreme Court precedent means that the state court "identifie[d] the correct governing legal principle from [Supreme Court] decisions but unreasonably applie[d] that principle to the facts" of the case. *Williams*, 529 U.S. at 413. As opposed to the "contrary to" prong, the "unreasonable application of" prong "does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied." *See Panetti v. Quarterman*, 551 U.S. --, 127 S. Ct. 2842, 2858 (2007). But, we have explained that "to be found an unreasonable application of clearly established Federal law, the state-court decision must be objectively unreasonable and not simply erroneous or incorrect." *Benge*, 474 F.3d at 241 (quotation and editorial marks omitted) (quoting *Williams*, 529 U.S. at 409-11).

Thus, the question is whether the Kentucky court was "objectively unreasonable," *see Benge*, 474 F.3d at 241, in reaching its decision that there was no constitutional violation. That is: was the Kentucky court "objectively unreasonable" in failing to apply the possible-temptation test to a matter of mere kinship and, correspondingly, failing to find a due process violation, based on that test. It is noteworthy that, in considering this question, at least two circuit courts have ruled similarly on facts virtually identical to those before the Kentucky court, *see*, *e.g.*, *Davis*, 506 F.3d at 1325; *Dyas*, 705 F.2d at 993, and every other circuit court, without exception, to apply the possible-temptation test has done so in a manner limited to pecuniary interest or contempt. Even acknowledging that all of these courts *could be* wrong — though we by no means suggest here that they are — the important fact is that their possible (or even probable) wrongness is irrelevant; what is relevant is the mere existence of these cases, which were in October 2004 — just as now — unrefuted. Their existence means that a similar outcome (even if similarly wrong), is not objectively unreasonable, it is instead *presumptively reasonable*. Indeed, that is the fundamental theory of persuasive precedent (particularly persuasive precedent from other jurisdictions) — although a court is not *bound* by it, it is presumptively reasonable (even prudent, and often commendable) to follow it because, having been created through the adversarial process and the thoughtful consideration of our fellow judges, it is presumptively meritorious (albeit, still subject to reasoned disagreement).

So, unless we could demonstrate the objective unreasonableness of every court to decide this issue — which we cannot — or we are willing to condemn the entire concept of persuasive precedent — which we are not — we cannot conclude that the Kentucky court's decision was an unreasonable application of Supreme Court precedent. We must wait until another day for an answer to whether mere kinship between prosecutor and judge is enough to create probable bias and violate due process. Indeed, we might have that opportunity on a direct appeal, but we do not have it here.

For his part, Railey relies primarily on 28 U.S.C. § 455(b)(5) (governing when a *federal* judge must disqualify himself based on a close familial relationship), the Code of Conduct for United States Judges, and the American Bar Association's Model Code of Judicial Conduct. But Railey concedes that the Supreme Court has never held that § 455(b)(5) creates a constitutional standard for judicial recusal in the *state* courts. In fact, the Supreme Court has indicated that a statute requiring the disqualification of a judge based on bias or prejudice "would not be [a] sufficient basis for imposing a constitutional requirement [for disqualification] under the Due Process Clause." *Aetna*, 475 U.S. at 820-21. Therefore, neither the federal recusal statute nor the judicial codes of conduct provide any basis for granting habeas relief. *See Davis*, 506 F.3d at 1336 ("the federal recusal statute establishes stricter grounds for disqualification than the Due Process Clause"); *Couch*, 896 F.2d at 81 (§ 455 "and the Due Process Clause are not coterminous"); *Hardy*, 878 F.2d at 97 (§ 455's "appearance of impropriety standard" is not "mandated by the Due Process Clause").

The Kentucky court's determination that Railey's constitutional rights were not violated by Judge Bertram's presiding over Railey's proceedings is neither contrary to, nor an unreasonable application of, clearly established federal law. Railey is not entitled to habeas relief on this claim.

## B. Ineffective Assistance of Counsel

Railey next asserts that his counsels' ineffectiveness caused him to plead guilty, and but for their actions, he would not have done so. An "ineffective assistance of counsel claim is a mixed question of law and fact, for which district-court determinations are subject to *de novo* review." *Lucas v. O'Dea*, 179 F.3d 412, 416 (6th Cir. 1999). It has two components:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.
>
> Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984) (paragraph break added). Specifically, when addressing an ineffective-assistance-of-counsel claim in the context of a guilty plea, "[t]he second, or 'prejudice,' requirement, . . . focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process." *Hill v. Lockhart*, 474 U.S. 52, 58-59 (1985). The Court went on to explain: "In other words, in order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.*

### 1. Failure to Inform Railey of Judge Bertram's Relationship to Prosecutor Bertram

Railey contends that his counsel were ineffective because they failed to object to Judge Bertram's adjudication of the case, failed to make Railey aware of the familial relationship between the judge and the prosecutor, and failed to procure a proper waiver concerning Judge Bertram's adjudication of the case. The government does not argue that this claim of ineffective assistance was defaulted, although it appears from the record that Railey failed to present it to the Kentucky courts.[8] But assuming that Railey did not default the claim, it nevertheless fails. Even if his attorneys did

---

[8] In his habeas petition, Railey alleged that his attorney failed to notify him about Judge Bertram, but he did not state clearly or expressly that this constituted ineffective assistance, and the district court did not address this contention.

not tell him about Judge Bertram's relationship to Prosecutor Bertram, Railey cannot show that there is a reasonable probability he would not have pled guilty. Regardless of which judge presided over the case, Railey would still have had the same plea agreement before him, the same evidence confronting him, two disagreeing attorneys (one of whom favored going to trial, while the other favored taking the plea), and the same potential sentence of 40 years in prison if he lost at trial.

### 2. *Failure to Adequately Advocate Railey's Case*

Railey next argues that his defense attorneys were ineffective because they failed to advocate Railey's case adequately, consult with Railey, keep him informed as to all of his legal options, or properly advise him on any defenses, specifically voluntary intoxication, applicable to the charges against him. Railey asserts that his attorneys disagreed with each other as to whether he should go to trial or take a plea and that their conflicting advice confused him. Citing *Strickland*, the Kentucky court found no clear error in the trial court's determination that Railey's counsel were not ineffective. The court concluded that Railey's "counsel educated [Railey] on the range of options available to all defendants, entering a plea or proceeding to trial." The court's determination that Railey's counsel were not deficient is neither contrary to nor an unreasonable application of *Strickland*.

Railey maintains that his attorneys "did not fully explore the efficacy of any potential defenses, which is apparent from Railey's statements illustrating a misunderstanding of the law and a belief that proper defenses did exist in his case." As evidence, Railey points to a statement he read at his sentencing hearing, in which he stated that the shooting was unintentional, that his "lawyers advised [him] . . . that whether it was an accident or not, [the shooting] still constitutes as a first degree assault," that he chose "to take the plea not because [he thought he] deserve[d] it but because [his] attorneys ha[d] advised [him] to do so . . . to keep from hurting [the victim] any more," and that he had an alcohol problem. But Railey's statement does not suggest that his attorneys failed to counsel him about potential defenses. Consistent with the wording of the indictment, the government could have prosecuted Railey on the first-degree assault count under either a theory of specific intent or wanton conduct[9] — and Railey's intent is immaterial as it relates to wanton conduct. While Kentucky law provides that voluntary intoxication "negate[s] specific intent," it "does *not* negate culpability for a crime requiring a culpable mental state of wantonness or recklessness." *McGuire v. Kentucky*, 885 S.W.2d 931, 934 (Ky. 1994) (emphasis added). Therefore, his attorneys' explanation — that the shooting, whether accidental or not, constituted first-degree assault — accurately reflects Kentucky law.[10] Moreover, defense counsel raised the accidental aspect of the shooting as a mitigating factor to reduce his sentence. The record simply does not support Railey's assertions of deficient performance or prejudice. The district court did not err by concluding that the state court's conclusion that Railey failed to establish ineffective

---

[9] Under Kentucky law, a person commits first-degree assault when "(a) [h]e intentionally causes serious physical injury to another person by means of a deadly weapon or a dangerous instrument; or (b) [u]nder circumstances manifesting extreme indifference to the value of human life he wantonly engages in conduct which creates a grave risk of death to another and thereby causes serious physical injury to another person." KY. REV. STAT. § 508.010(1). A person commits second-degree assault when he "intentionally causes physical injury," or when he "wantonly causes serious physical injury to another person by means of a deadly weapon or dangerous instrument." KY. REV. STAT. § 508.020(1)(a)-(b). The indictment charged Railey with first-degree assault for the shooting, because of his intentional *or* wanton conduct, and with two counts of second-degree assault for the prior acts (the beating with a belt and the cutting with a knife), because of Railey's intentional conduct.

[10] We also note that first-degree assault is a Class B felony, and under Kentucky law, the sentence for a Class B felony is "not less than ten (10) years nor more than twenty (20) years." KY. REV. STAT. § 532.060(2)(b). Even without the second-degree assault charges, Railey would have faced a minimum sentence of 10 years had he gone to trial — the same amount of time he received as a result of the plea agreement. Under these facts, there is no basis to conclude that Railey would not have pled guilty or that his counsel erred in advising him to plead guilty.

assistance of counsel was not an unreasonable application of or contrary to clearly established federal law.

### C. Involuntary Guilty Plea

Railey argues that his plea was not voluntary because he did not understand the law in relation to the facts, inasmuch as he was unaware that the circumstance of voluntary intoxication could be argued to negate specific intent. As evidence of his misunderstanding, Railey refers to his repeated — and consistent — assertions that all three alleged instances of assault were accidental because he did not commit them purposefully. Presumably, if he had known that voluntary intoxication could benefit his case, he would have argued that he was intoxicated.

"The longstanding test for determining the validity of a guilty plea is 'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'" *Hill*, 474 U.S. at 56 (quoting *North Carolina v. Alford*, 400 U.S. 25, 31 (1970)). Moreover, "[t]he factual findings of a state court that the plea was proper generally are accorded a presumption of correctness." *Garcia v. Johnson*, 991 F.2d 324, 326 (6th Cir. 1993). Here, the Kentucky Court of Appeals concluded:

> Railey asserts that the trial court erred in finding his guilty plea to have been educated and voluntary. The trial court noted that the court held a careful inquiry as required by *Boykin v. Alabama*, 395 U.S. 238, 242 (1969), prior to accepting the guilty plea. The statements made by Railey on the record show that his plea was voluntary, and made knowingly and intelligently. Railey informed the court of his mental state prior to entering the plea. He stated that he was not under the influence of any stimulants. Railey affirmed that he had ample opportunity to discuss the evidence and options available to him with counsel, and that nothing further remained to be discussed with counsel. Railey also stated that he believed his attorneys were fully informed regarding the case. The court reviewed Railey's constitutional rights with him and informed him of the possible penalties he was facing, and the sentence he was agreeing to if he entered the plea.
>
> Where, as here, the record supports the finding that a plea was freely, knowingly and intelligently made, the conviction will not be reversed. Further, as the Commonwealth notes, Railey signed a 'Waiver of Further Proceedings with Petition to Enter Plea of Guilty,' and counsel signed a 'Certificate of Counsel' showing that Railey had been notified of his rights prior to entry of the plea. The Kentucky Supreme Court has held that the signing of such documents is sufficient to prove that a plea is freely and intelligently entered into.

*Railey*, 2004 WL 2201368, at *2 (certain citations omitted).

The transcript of the plea hearing supports the state court's conclusion that Railey's plea was knowing and voluntary. The trial court discussed with Railey the rights that he would waive by entering a plea of guilty. Railey's attorneys stated that they were satisfied that he entered the plea knowingly, voluntarily, and intelligently. Railey also signed a statement to enter his guilty plea, which contained the following: "I have reviewed a copy of the indictment and told my attorney all the facts known to me concerning my charges. I believe he/she is fully informed about my case. We have fully discussed, and I understand, the charges and any possible defenses to them."

Despite his protests to the contrary, Railey has simply not overcome the presumption of correctness we apply to the state court's determination that a plea was entered knowingly and voluntarily. Moreover, Railey fails to identify any basis for concluding that the state court's determination is an unreasonable application of or contrary to clearly established federal precedent.

### III.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

---

**DISSENT**

---

KAREN NELSON MOORE, Circuit Judge, dissenting. When Ricky Dale Railey ("Railey") was prosecuted in Kentucky state court, the judge who presided over Railey's case was the nephew of the county prosecutor. George Barry Bertram, the county prosecutor ("Prosecutor Bertram"), personally participated in two hearings in Railey's case before Marion County Circuit Judge Allen Ray Bertram ("Judge Bertram"); the first hearing addressed Railey's motion to reduce bond, and the second was Railey's plea hearing. In ruling upon Railey's state post-conviction appeal, the Kentucky Court of Appeals noted that trial judges are "vested with the discretion to determine whether bail is appropriate" and concluded that Railey's constitutional right to an unbiased judge was not "prejudiced" in this case because "Railey has made no showing that the trial court abused its discretion" in the bail determination. Joint Appendix ("J.A.") at 187 (Ky. Ct. App. Op. at 6). The majority holds that this determination is neither contrary to nor an unreasonable application of clearly established federal law. Because the Supreme Court has held in multiple cases that the "appearance of bias" has violated the Due Process Clause and has repeatedly held that judicial bias is a structural error, not susceptible to an analysis evaluating harmlessness or "prejudice," I believe that the Kentucky Court of Appeals's decision is contrary to clearly established federal law. Further, under clearly established federal law, Railey's case involved a violation of the Due Process Clause. Accordingly, I would reverse the district court's denial of Railey's petition for a writ of habeas corpus, and I therefore dissent.

## I. The Kentucky Court of Appeals's Adjudication of Railey's Judicial-Bias Claim and Our Standard of Review

The Kentucky Court of Appeals denied Railey's judicial-bias claim based on the following analysis, quoted in full:

> Railey argues that there was a relationship between the trial court and the prosecution such that the judge should have recused himself. The record shows that the judge is the nephew of the Commonwealth's Attorney. This relationship was previously known to defense counsel, and was made known to all parties before trial. Railey was notified of the relationship, and waived the disqualification of the judge. The appellant must show bias on the part of the court such that the judge could not be impartial in the case. *Brand v. Commonwealth*, Ky. App., 939 S.W.2d 358, 359 (1997). No evidence of bias is presented by Railey, other than the contention that he was denied bail. The trial court is vested with the discretion to determine whether bail is appropriate. *Abraham v. Commonwealth*, Ky. App., 565 S.W.2d 152, 158 (1977). Railey has made no showing that the trial court abused its discretion. The claim that Railey's constitutional rights were prejudiced is unsupported by the record before this court. We affirm the trial court's ruling.

J.A. at 187 (Ky. Ct. App. Op. at 6).

The majority notes that Railey has challenged the state court's factual finding that he "waived" his challenge to Judge Bertram's involvement in this case, but the majority declines to address this point. Maj. Op. at 4. Instead, the majority first declares that the state court must have meant that Railey "forfeited" his claim and then concludes that, in any event, the dispositive issue is the legal question of whether the state court's decision regarding Railey's claim of judicial bias is contrary to or an unreasonable application of the Supreme Court's standard for analyzing judicial-bias claims. *Id.* at 4-5. I agree that the legal inquiry is the dispositive inquiry in this case, but side-

stepping this preliminary factual challenge masks the inadequate and flawed nature of the state court's legal analysis of Railey's constitutional judicial-bias claim. For that reason, I briefly consider Railey's factual challenge and the state court's factual determination of waiver.

The record contains no evidence that Railey knew of or acquiesced to the relationship between the judge and prosecutor in this case. The Kentucky Court of Appeals's opinion cites *no evidence whatsoever* in stating that "Railey was notified of the relationship [between the judge and prosecutor] and waived the disqualification of the judge." J.A. at 187 (Ky. Ct. App. Op. at 6). The warden's appellate brief contains a similar unsupported assertion. Resp't Br. at 10. Railey alone cited the record on this issue, noting the following exchange at the close of Railey's arraignment:

> The Court [Judge Bertram]: You'll go over the judge disqualification with [Railey]?
> Mr. Hagan: Yes, sir, I will.
> The Court: Thank you.
> Mr. Hagan: Thank you, Judge.

J.A. at 210 (Arraignment Hr'g Tr. at 6). Railey did not even speak at this brief hearing, and a different prosecutor, Timothy Cocanougher, represented the Commonwealth of Kentucky. The record lacks any other evidence that Railey knew of or consented to the involvement of Prosecutor Bertram in a case over which his nephew, Judge Bertram, was presiding.[1] Further, contrary to the majority's speculation that the state court meant that Railey "forfeited" rather than "waived" this claim,[2] a later opinion by the Kentucky Supreme Court, considering a different defendant's appeal and a challenge to Judge Bertram presiding over a prosecution conducted by Prosecutor Bertram, also referred to waiver. *See McCrobie v. Commonwealth*, No. 2005-SC-0886-MR, 2006 WL 2987082 (Ky. Oct. 19, 2006). In *McCrobie*, the Kentucky Supreme Court observed that the disqualification of a judge "may be waived by the parties affected" and noted that the defendant in that case "did sign a waiver along with his attorney and the assistant Commonwealth Attorney." *Id.* at *2. No such signed waiver appears in the record of this case, and the record lacks any clear indication that Railey waived this challenge.

Insofar as the state court's finding of "waiver" addressed Railey's constitutional judicial-bias claim, it appears that the state court's decision was both "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2), and "contrary to" or "an unreasonable application of" clearly established federal law as determined by the Supreme Court. *See Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) ("[W]aiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege."); *Carnley v. Cochran*,

---

[1] The Kentucky Circuit Court, in overruling Railey's motion to vacate his guilty plea and judgment, simply stated that "the Court advised the Defendant and each of his attorneys of the relationship at arraignment" and that "Hagan is a local and regular practicing attorney in this circuit and is quite familiar with the relationship. The Defendant was advised of the relationship and waived the disqualification of the judge." J.A. at 128 (Circuit Ct. Order at 4). The quoted language lacks any citation to the record. Further, as the quotation in the text above demonstrates, Judge Bertram did *not* advise *Railey* of the family relationship at the arraignment; Judge Bertram spoke to Railey's attorney. Further, although Judge Bertram did request that Railey's attorney "go over the judge disqualification" with Railey, Judge Bertram did *not* specify any particular ground for disqualification.

[2] This speculative conclusion is particularly unfounded given the language in the state-court opinion: the court asserted that "Railey was *notified* of the relationship, and waived the disqualification of the judge." J.A. at 187 (Ky. Ct. App. Op. at 6) (emphasis added). One would hardly say that, after a police officer "notified" a suspect of her *Miranda* rights, the suspect "forfeited" the right to remain silent by giving a statement. Rather, the inquiry would focus on whether the alleged waiver was knowing, intelligent, and voluntary. The problem in this case is that the record lacks any evidence demonstrating that the court did, in fact, notify Railey about the relationship and that Railey's decision to proceed was knowing, intelligent, and voluntary.

369 U.S. 506, 516 (1962) ("Presuming waiver from a silent record is impermissible."). In light of the Kentucky Supreme Court's subsequent decision in *McCrobie*, however, I believe that the Kentucky Court of Appeals made the factual determination of waiver in this case as it pertained to Railey's *state-law* claim of judicial disqualification under Kentucky law, which requires that "[a] judge shall disqualify himself from any proceeding when he is related to any party within a third degree of relationship." *McCrobie*, 2006 WL 2987082, at *2 (citing K.R.S. 26A.015(2)(d)(2)).

The significance of determining that the state court's waiver analysis pertains to a state-law claim is two-fold. First, as the majority observes, "we do not consider on habeas review a state court's determination of state law." Maj. Op. at 4 (citing *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005)). Second, the waiver determination accounts for a large portion of the state court's analysis of Railey's claim that Judge Bertram should not have presided over his case. *See* J.A. at 187 (Ky. Ct. App. Op. at 6). As I explain below, the remainder of the state court's analysis regarding Railey's constitutional judicial-bias claim is directly contrary to Supreme Court precedent—in which case we review Railey's judicial-bias claim de novo.

In resolving Railey's constitutional judicial-bias claim, the Kentucky Court of Appeals stated that "the claim that Railey's constitutional rights were *prejudiced* is unsupported by the record before this court." J.A. at 187 (Ky. Ct. App. Op. at 6) (emphasis added). The majority recognizes that "it is beyond dispute that judicial bias is structural error" that may not be evaluated for harmlessness or prejudice. Maj. Op. at 4 (citing *Washington v. Recuenco*, 548 U.S. 212, 218-19 & n.2 (2006)). The majority thus must stretch to characterize the state court's scant analysis of Railey's constitutional judicial-bias claim as "essentially finding no structural error, which is the kind of error that would flow from a judicial-bias-based due process violation." Maj. Op. at 17.

Unlike the majority, I see nothing in the state court's opinion that shows the court found an absence of structural error. To the contrary, the Kentucky Court of Appeals's opinion appears to have evaluated Railey's judicial-bias claim for *prejudice*, an analysis that is wholly incompatible with structural error, which requires automatic reversal. After noting Railey's argument that the trial court denied him bail, the Kentucky Court of Appeals cited Kentucky law for the proposition that trial courts have considerable discretion in determining bail and then concluded as follows: "Railey has made no showing that the trial court abused its discretion. The claim that Railey's constitutional rights were prejudiced is unsupported by the record before this Court. We affirm the trial court's ruling." J.A. at 187 (Ky. Ct. App. Op. at 6). Although the Kentucky Court of Appeals, in stating that "[t]he claim that Railey's constitutional rights were prejudiced is unsupported by the record before this Court," might simply have intended to state the conclusion that no error occurred in this case and that Railey's constitutional rights were not "violated," such an interpretation is highly doubtful. The court's reference to Railey's constitutional rights follows directly after a sentence highlighting Railey's inability to show that the trial court abused its discretion in denying him bail—that is, Railey's inability to show "prejudice" regarding the trial court's bail determination.

The majority attributes the state court's use of the word "prejudiced" to "simple inadvertence," Maj. Op. at 3 n.1, despite the context of the opinion, which clearly analyzed Railey's claim for prejudice. The majority recognizes that courts "often consider whether a party was *prejudiced* because a constitutional right was *violated*" and even acknowledges that "the use of the word 'prejudiced' in this context [of a structural error] is clearly incorrect." *Id.* Nonetheless, the majority "assume[s]" that the state court "meant that Railey was not prejudiced and his rights were not violated" and asserts, without explanation, that such "a reading . . . is supported by the entire context of the court's holding." *Id.* As explained above, however, the context is the state court's analysis that evaluated Railey's claim *for prejudice*—i.e., its analysis highlighted Railey's inability to show that the trial court abused its discretion in denying him bail. A court evaluating a defendant's claim of a structural error simply has no occasion to refer to prejudice; the state court's

use of the word "prejudiced" here demonstrates that it did not appreciate the nature of Railey's claim.

Because the Kentucky Court of Appeals treated Railey's constitutional claim of judicial bias as susceptible to an analysis evaluating any error for prejudice, its opinion is "contrary to" clearly established federal law. The Supreme Court has explained that "[a] state-court decision will certainly be contrary to our clearly established precedent if the state court *applies a rule* that contradicts the governing law set forth in our cases." *Williams v. Taylor*, 529 U.S. 362, 405 (2000) (emphasis added). And in such a circumstance, "a federal court will be unconstrained by § 2254(d)(1)," *id.* at 406, "and de novo review is appropriate." *Fulcher v. Motley*, 444 F.3d 791, 799 (6th Cir. 2006); *see also Panetti v. Quarterman*, 127 S. Ct. 2842, 2858-59 (2007) (stating "that § 2254 does not preclude relief if either 'the reasoning [or] the result of the state-court decision contradicts [our cases]'") (quoting *Early v. Packer*, 537 U.S. 3, 8 (2002)) (alterations in original).

In *Williams*, the Supreme Court used its decision in *Strickland v. Washington*, 466 U.S. 668 (1984), to provide a hypothetical example of a state-court decision that would be "contrary to" clearly established Supreme Court precedent. The Court explained that "[i]f a state court were to reject a prisoner's claim of ineffective assistance of counsel on the grounds that the prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding would have been different," then such a state-court decision would be "contrary to" the Supreme Court's "clearly established precedent because we held in *Strickland* that the prisoner need only demonstrate a 'reasonable probability that . . . the result of the proceeding would have been different.'" *Williams*, 529 U.S. at 405-06 (quoting *Strickland*, 466 U.S. at 694). Given that the Supreme Court has repeatedly held that judicial bias is a structural error, an analysis that evaluates judicial bias for prejudice is "contrary to" clearly established federal law.

## II.  Railey's Judicial-Bias Claim Under Clearly Established Federal Law

Having determined that the Kentucky Court of Appeals, in evaluating Railey's judicial-bias claim for prejudice, applied a rule and employed reasoning contrary to clearly established federal law, I now turn to analyzing Railey's claim de novo. Because I conclude that Railey's judicial-bias claim satisfies the Supreme Court's standard, I would grant Railey's petition for a writ of habeas corpus.

In *In re Murchison*, 349 U.S. 133, 136 (1955), the Supreme Court held that "[a] fair trial in a fair tribunal is a basic requirement of due process" and explained that "our system of law has always endeavored to prevent even the probability of unfairness." Although the probability of unfairness or the level at which a judge's interest in a case becomes constitutionally improper "cannot be defined with precision," the Supreme Court explained that "[c]ircumstances and relationships must be considered" and "that '*Every procedure* which would offer a possible temptation to the average man as a judge . . . not to hold the balance nice, clear, and true between the State and the accused denies the latter due process of law.'" *Id.* (quoting *Tumey v. Ohio*, 273 U.S. 510, 532 (1927)) (emphasis added). Most importantly, the Supreme Court then observed that its standard for analyzing whether a judge faced a "possible temptation" was a "stringent rule [that] *may sometimes bar trial by judges who have no actual bias* and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way, 'justice must satisfy the *appearance* of justice.'" *Id.* (quoting *Offutt v. United States*, 348 U.S. 11, 14 (1954)) (emphases added).

In *Murchison*, the Supreme Court thus applied the "possible-temptation test"—a test that it originally set forth in *Tumey*, which involved a system in which the mayor of an Ohio village received no payment for presiding over a criminal case unless the case resulted in a conviction, *Tumey*, 273 U.S. at 520; *see also* Maj. Op. at 6-7—to determine when the Due Process Clause bars

a judge from participating in a given case. Under the possible-temptation test, a judge's participation is unconstitutional when, considering "[c]ircumstances and relationships," there exists "a possible temptation to the average . . . judge . . . not to hold the balance nice, clear, and true between the State and the accused." *Murchison*, 349 U.S. at 136 (quotation omitted). After setting forth this standard, the Court then examined the factual situation in *Murchison*—involving Michigan's system in which a judge could act "at the same time [as] the complainant, indicter and prosecutor" on a charge of contempt—and held that Michigan's system violated the Court's "possible temptation" standard because "a judge cannot be, in the very nature of things, wholly disinterested in the conviction or acquittal of those accused" when the same judge served as the single-person grand jury that accused the defendant. *Id.* at 135, 137.

Although the Supreme Court has considered judicial-bias claims on several occasions, *see Withrow v. Larkin*, 421 U.S. 35, 47 nn. 14 & 15 (1975) (citing cases), two further cases provide useful illustrations of the Court's application of the possible-temptation standard. In *Ungar v. Sarafite*, 376 U.S. 575 (1964), and *Taylor v. Hayes*, 418 U.S. 488 (1974), the Supreme Court again analyzed judicial-bias claims in the context of contempt proceedings. In both cases, the Court's analysis employed the possible-temptation principle and considered whether the circumstances were such that the judge was capable of "hold[ing] the balance nice, clear, and true between the State and the accused." *Murchison*, 349 U.S. at 136 (quotation omitted). In *Ungar*, the Court characterized the right at issue as the "right to be tried by an unbiased judge without a direct personal interest in the outcome of the hearing." *Ungar*, 376 U.S. at 584. The Court concluded that no due process violation occurred because, in contrast to the facts in *Murchison* and other prior cases, the trial judge "gave notice and afforded an opportunity for a hearing which was conducted dispassionately" such that there was not "an appearance of bias that the judge was unable to hold the balance between vindicating the interests of the court and the interests of the accused." *Id.* at 588.

In *Taylor*, the Supreme Court explained that "contemptuous conduct, though short of personal attack, may still provoke a trial judge and so embroil him in controversy that he cannot 'hold the balance nice, clear, and true between the state and the accused.'" *Taylor*, 418 U.S. at 501 (quoting *Tumey*, 273 U.S. at 532). The Court further observed that "[i]n making this ultimate judgment, the inquiry must be not only whether there was actual bias on [the judge's] part, but also whether there was 'such a likelihood of bias or an appearance of bias.'" *Id.* (quoting *Ungar*, 376 U.S. at 588). The Court concluded that a due process violation had occurred in the case before it because the record disclosed an appearance that the judge "did become embroiled in a running controversy with" the person convicted of contempt. *Id.*

In light of such cases, the majority thus recognizes that the Supreme Court has "held that something less than actual bias violates constitutional due process." Maj. Op. at 5. Nonetheless, the majority asserts that the Court has limited those occasions to two circumstances, cases in which the judge has a personal, substantial pecuniary interest and "certain contempt cases, such as those in which the 'judge becomes personally embroiled with the contemnor.'" Maj. Op. at 5 (quoting *Murchison*, 349 U.S. at 141 (Reed, J., dissenting)). In doing so, the majority's crucial contention is that there is "no support for . . . the proposition that the possible-temptation test applies to likelihood- or appearance-of-bias issues generally, rather than to only pecuniary interest." Maj. Op. at 9.

The Supreme Court's decisions in *Murchison*, *Ungar*, and *Taylor* contradict the majority's attempt to cabin the possible-temptation standard to cases involving only pecuniary interests.[3]

---

[3] Indeed, in a footnote to its claim that "the possible-temptation test applies . . . to only pecuniary interest" cases, Maj. Op. at 9, the majority even acknowledges that its limitation is incorrect, conceding in the footnote that "it is evident" that the possible-temptation test applies to cases other than those involving pecuniary interests, such as contempt proceedings, *id.* at 9 n.5.

Indeed, the majority does acknowledge that *Murchison* "extend[ed] the possible-temptation test to the first (and, as of yet, only) type of circumstances other than pecuniary remuneration." Maj. Op. at 7. But pecuniary interests were not at issue in *Murchison*, *Ungar*, or *Taylor*, yet in each case the Court analyzed whether the circumstances were such that they might present a possible temptation for the judge not "to hold the balance between vindicating the interests of the court and the interests of the accused." *Ungar*, 376 U.S. at 588. Indeed, in *Ungar* the Court's analysis specifically explained that the circumstances involved "an unbiased and impartial judge without a direct *personal* interest in the outcome of the hearing," omitting any reference to a pecuniary interest. *Ungar*, 376 U.S. at 584 (emphasis added).

The majority limits the possible-temptation test to cases involving pecuniary interests (and, apparently, to cases involving a variety of different contempt proceedings) solely on the basis of a questionable reading of the Supreme Court's opinion in *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813 (1986). In *Lavoie*, the Supreme Court held that a due-process violation occurred because a Justice of the Alabama Supreme Court participated in a case when he had a pending lawsuit raising a claim against an insurance company similar to that raised in the case before the Alabama Supreme Court. *Lavoie*, 475 U.S. at 821-825. As the majority notes, the Supreme Court considered the insurance company's various arguments in different sections of the opinion.

In section III.A, the Supreme Court devoted approximately two pages to dispatching the insurance company's argument that the Alabama Supreme Court Justice's "general hostility towards insurance companies" was sufficient to state a violation of the Due Process Clause. *Id.* at 820. In rejecting this claim in short order, the Court began by quoting language from *Tumey* stating that "not '[a]ll questions of judicial qualification . . . involve constitutional validity. Thus matters of kinship, personal bias, state policy, remoteness of interest, would seem generally to be matters merely of legislative discretion.'" *Id.* at 820 (quoting *Tumey*, 273 U.S. at 523) (alteration and omission in original). The Court stated that "[w]e need not decide whether allegations of bias or prejudice by a judge of the type we have here would ever be sufficient under the Due Process Clause to force recusal. Certainly only in the most extreme of cases would disqualification on this basis be constitutionally required, and [the insurance company's] arguments here fall well below that level." *Id.* at 821. Noting the insurance company's suggestions that the Alabama Supreme Court Justice's "general frustration with insurance companies reveals a disqualifying bias," the Court simply concluded that the insurance company's "allegations of bias and prejudice on this general basis . . . are insufficient to establish any constitutional violation." *Id.*

Based on the Court's cursory analysis of the insurance company's mere allegations regarding the Alabama Supreme Court Justice's "general frustration with insurance companies," the majority here declares that "[i]t is noteworthy that the Court referenced kinship in this portion of the analysis, but it is far more significant that the Court omitted from this portion of its analysis any reference to the possible-temptation test." Maj. Op. at 9. As the majority notes, in the following section the Court did quote and apply the possible-temptation test in analyzing the insurance company's (ultimately meritorious) argument that the Alabama Supreme Court Justice's own pending lawsuit raising a similar insurance claim required his recusal. As a result, the majority contends that reading these two sections of *Lavoie* "in concert . . . offer[s] no support for—and even appear[s] to refute—the proposition that the possible-temptation test applies to likelihood- or appearance-of-bias issues generally, rather than to only pecuniary interest." Maj. Op. at 9. As I have already stated, this conclusion fails to account for the Supreme Court's consistent use of the possible-temptation analysis in multiple other cases such as *Murchison*, *Ungar*, and *Taylor*, which involved a variety of different contempt proceedings. Further, the majority attaches far too much significance to a purported "omission" from the Court's abbreviated analysis in section III.A of *Lavoie*, in which the Court simply rejected the clearly meritless argument that "general frustration with insurance companies" amounted to a constitutional basis for disqualifying a judge from hearing a case involving an insurance company.

The crux of the matter is that the Supreme Court has applied the possible-temptation analysis in a wide variety of cases. *See Tumey*, 273 U.S. at 520 (violation when "[t]here is . . . no way by which the mayor may be paid for his service as a judge, if he does not convict those who are brought before him"); *Murchison*, 349 U.S. at 135 (violation when judge acts "at the same time [as] the complainant, indicter and prosecutor" in contempt proceeding); *Ward v. Village of Monroeville*, 409 U.S. 57, 59 (1972) (violation because a possible temptation exists when "the revenue produced from a mayor's court provides a substantial portion of a municipality's funds") (quotation omitted); *Taylor*, 418 U.S. at 501 (violation when contemptuous conduct "so embroil[s the judge] in controversy that [the judge] cannot hold the balance nice, clear, and true between the state and the accused") (quotation omitted); *Lavoie*, 475 U.S. at 821-825 (violation when a judge ruled on case involving an issue similar to that raised in the judge's own pending lawsuit). As the Court explained the possible-temptation test in *Murchison*, a judge's participation in a case violates due process when, considering "[c]ircumstances and relationships," there exists "a possible temptation to the average . . . judge . . . not to hold the balance nice, clear, and true between the State and the accused." *Murchison*, 349 U.S. at 136 (quotation omitted). Although the possible-temptation analysis is a general standard and not a precise rule, the Supreme Court has emphasized that the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254 ("AEDPA"), "does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied." *Panetti v. Quarterman*, 127 S. Ct. 2842, 2858 (2007) (quotation omitted).

Before applying this standard to Railey's claim, I must briefly address the majority's contention that describing the possible-temptation analysis as clearly established is "best characterized as *arguable*." Maj. Op. at 16. The Supreme Court has repeatedly employed the possible-temptation analysis and, on several occasions, held that the mere appearance of bias violated due process. *See, e.g.*, *Lavoie*, 475 U.S. at 825 ("mak[ing] clear that *we are not required to decide whether in fact Justice Embry was influenced*, but only whether sitting on the case then before the Supreme Court of Alabama would offer a possible temptation to the average . . . judge to . . . lead him not to hold the balance nice, clear and true") (quotation omitted and omissions in original) (emphasis added). Nonetheless, in reviewing various decisions from our sister circuits, the majority has uncovered some decisions that have asserted, erroneously, that "'the Supreme Court's case law has not held, not even in dicta, . . . that the mere appearance of bias on the part of a state trial judge, without more, violates the Due Process Clause.'" Maj. Op. at 15 (quoting *Johnson v. Carroll*, 369 F.3d 253, 263 (3d Cir. 2004)); *see also* Maj. Op. at 16 (discussing *Davis v. Jones*, 506 F.3d 1325 (11th Cir. 2007)).[4] The majority then makes the astonishing claim that, even assuming the possible-temptation test is clearly established, "the mere existence of these cases . . . means that a similar outcome (even if similarly wrong), is not objectively unreasonable, it is instead *presumptively reasonable*." Maj. Op. at 17. The majority concludes with the declaration that unless "we are willing to condemn the entire concept of persuasive precedent . . . we cannot conclude that the Kentucky court's decision was an unreasonable application of Supreme Court precedent." Maj. Op. at 17.

---

[4] In contrast to the cases that the majority identifies, several other cases, including one from our circuit, have held or stated that it is clearly established federal law that the appearance of bias may violate the Due Process Clause. *See Crater v. Galaza*, 491 F.3d 1119, 1131 (9th Cir. 2007) (stating the Supreme Court precedent reveals "three circumstances in which an appearance of bias—as opposed to evidence of actual bias—necessitates recusal"); *Jones v. Luebbers*, 359 F.3d 1005, 1012 (8th Cir. 2004) ("[C]learly established Federal law, as determined by the Supreme Court of the United States, recognizes not only actual bias, but also the appearance of bias, as grounds for disqualification") (quotation and internal citation omitted); *Kinder v. Bowersox*, 272 F.3d 532, 540 (8th Cir. 2001) ("There is no question that the law on judicial bias is clearly established: a criminal defendant is constitutionally required to be tried before an impartial judge, and the likelihood or appearance of bias, even in the absence of actual bias, may prevent a defendant from receiving a fair trial."); *Phelps v. Hamilton*, 122 F.3d 1309, 1323 (10th Cir. 1997) ("To state a due process claim that a judge is biased, the claimant must show either that actual bias existed, or that an appearance of bias created a conclusive presumption of actual bias."); *Anderson v. Sheppard*, 856 F.2d 741, 746 (6th Cir. 1988) (stating that due process "require[s] not only an absence of actual bias, but an absence of even the appearance of judicial bias").

Leaving aside my conclusion that the "contrary to" prong of AEDPA provides the appropriate analysis for this case, the majority's view of the "unreasonable application" analysis is flawed and, in fact, is an unreasonable application of Supreme Court precedent. In *Williams v. Taylor*, 529 U.S. 362 (2000), Justice O'Connor's opinion for the Court *explicitly rejected* the Fourth Circuit's very similar view of the "unreasonable application" analysis. In *Williams*, the Court rejected the Fourth Circuit's prior holding "that a state-court decision involves an 'unreasonable application of . . . clearly established Federal law' only if the state court has applied federal law 'in a manner that reasonable jurists would all agree is unreasonable.'" *Williams*, 529 U.S. at 409 (quoting *Green v. French*, 143 F.3d 865, 870 (1998)). The Court further explained that a "federal habeas court should *not* transform the [unreasonable application] inquiry into a subjective one by resting its determination instead on the simple fact that at least one of the Nation's jurists has applied the relevant federal law in the same manner the state court did in the habeas petitioner's case." *Id.* at 409-10 (emphasis added). Rather, "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409. Finally, the Supreme Court noted that, as "with respect to the 'reasonable jurist' standard in the *Teague* [*v. Lane*, 489 U.S. 288 (1989),] context, '[e]ven though we have characterized the new rule inquiry as whether "reasonable jurists" could disagree as to whether a result is dictated by precedent, the standard for determining when a case establishes a new rule is "objective," and the *mere existence* of conflicting authority does not necessarily mean a rule is new.'" *Williams*, 529 U.S. at 410 (quoting *Wright v. West*, 505 U.S. 277, 304 (1992)) (alteration in original, emphasis added). Similarly, the "mere existence" of cases similar to a state court's opinion does *not* make the state court's opinion presumptively reasonable. The majority's discussion here of "the fundamental theory of persuasive precedent" essentially repeats the very error that the Supreme Court clearly and soundly rejected over eight years ago. Indeed, the majority's adoption of this view of "persuasive precedent," given the Supreme Court's rejection in *Williams* of a materially indistinguishable position, is a startling dereliction of our duty as an intermediate appellate court to follow the precedent of the Supreme Court. *See, e.g.*, *Hutto v. Davis*, 454 U.S. 370, 375 (1982) (stating that "a precedent of [the Supreme] Court must be followed by the lower federal courts").

Finally, having analyzed the Kentucky Court of Appeals's adjudication of Railey's claim and the nature of the Supreme Court's precedent regarding judicial-bias claims, I apply the possible-temptation standard to Railey's case. I conclude that Railey's Due Process Clause rights were violated when Judge Bertram presided over Railey's case, in which Prosecutor Bertram attended crucial hearings and personally contested Railey's motions. Although the Supreme Court has stated that "matters of kinship . . . would seem generally to be matters merely of legislative discretion," *Lavoie*, 475 U.S. at 820, the Supreme Court has also acknowledged that disqualification is constitutionally required "in the most extreme of cases," *id.* at 821. The situation of an uncle prosecuting a criminal case before his nephew judge is precisely such an extreme case.

Further, I emphasize that, as in *Lavoie*, holding that a violation of due process occurred here does "not require [] decid[ing] whether in fact [Judge Bertram] was influenced, but only whether sitting on the case . . . would offer a possible temptation to the average . . . judge to . . . lead him not to hold the balance nice, clear and true." *Id.* at 825 (quotation omitted and final two omissions in original). Considering "[c]ircumstances and relationships," the task of hearing and deciding upon legal arguments advanced by one's uncle offers more than a "possible temptation" to hold a balance that is not "nice, clear and true between the State and the accused." *Murchison*, 349 U.S. at 136.

This violation of Railey's due-process rights cannot be harmless. *Chapman v. California*, 386 U.S. 18, 23 & n.8 (1967) (stating that the right to an impartial judge is a "constitutional right[] so basic to a fair trial that [its] infraction can never be treated as harmless error") (footnote omitted). Thus, "the 'appearance of justice' will best be served by vacating the decision and remanding for further proceedings.'" *Lavoie*, 475 U.S. at 828.

For the reasons stated above, I would reverse the judgment of the district court and remand the case with instructions to issue the writ of habeas corpus.  I respectfully dissent.