<u>NOT RECOMMENDED FOR FULL-TEXT PUBLICATION</u>
File Name: 17a0397n.06

Case No. 15-1494

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| JIMMIE GORDON, | ) | |
| | ) | **FILED**<br>Jul 05, 2017<br>DEBORAH S. HUNT, Clerk |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| | ) | |
| BLAINE LAFLER, | ) | |
| | ) | |
| Respondent-Appellee. | ) | |
| | ) | OPINION |
| | ) | |

**BEFORE: BOGGS, SILER, and DONALD, Circuit Judges.**

**BERNICE BOUIE DONALD, Circuit Judge.** After a fight that led Jimmie Gordon to shoot and kill Francois Todd, a state jury convicted Gordon of first-degree murder, felonious assault, and felony firearm. During the trial, defense counsel and the trial judge bickered back and forth about various issues, including the judge's rulings and defense counsel's behavior. Gordon filed a habeas petition, alleging, as relevant here, (1) that he was denied a fair trial under the Due Process Clause of the Fourteenth Amendment because of the trial judge's bias against defense counsel; and (2) that he was deprived of his Sixth Amendment right to effective assistance of counsel by defense counsel's failure to raise this issue in a motion for new trial. The district court denied his petition. Gordon renews these arguments on appeal. For the reasons discussed below, we **AFFIRM** the district court's judgment.

I.

Gordon was charged with first-degree murder, felony firearm, and two counts of assault with intent to commit murder. The charges arose out of a shooting outside of Gordon's home in 2004. After an argument between Fallon Walker, Todd's sister, and Gordon's girlfriend, Ebony Jackson, Todd, Walker, and his mother, Latrell Todd ("Ms. Todd"), went to Gordon's home. Upon arriving, Todd demanded to know where Gordon's girlfriend was, after which Gordon ran into his house to get a rifle and fired six shots, one of which killed Todd. In 2005, the jury convicted Gordon of one count of first-degree murder, two counts of felonious assault, and one count of felony firearm. The court sentenced him to life imprisonment for the murder conviction, a concurrent term of seventeen months to four years for the assault convictions, and a consecutive term of two years for the firearm conviction.

On direct appeal, Gordon raised a variety of claims for relief, none of which is the subject of the instant appeal. The Michigan Court of Appeals affirmed his conviction and the Michigan Supreme Court denied leave to appeal.

In 2008, Gordon filed a federal habeas petition, but the district court granted him a stay while he moved for post-conviction remedies in state court. Gordon then initiated state collateral proceedings, arguing, as pertinent here, that the trial judge exhibited unconstitutional bias and that his trial counsel was constitutionally ineffective for failing to file a motion for new trial regarding the alleged judicial misconduct. The state trial court conducted an evidentiary hearing on the issue, and then denied Gordon's post-conviction motion. The Michigan Court of Appeals and the Michigan Supreme Court denied leave to appeal.

In 2012, Gordon filed a supplemental habeas petition arguing, as relevant to the instant appeal, that (1) he was denied a fair trial under the Due Process Clause of the Fourteenth Amendment because the trial judge engaged in judicial bias; and (2) he was deprived of his Sixth

Amendment rights to the effective assistance of counsel because trial counsel failed to file a motion for new trial raising the judicial bias claim.

The district court denied Gordon's petition. It held that the general allegations that the trial judge picked arguments with counsel, treated counsel's objections with contempt, and engaged in other similar conduct were not supported by the record. In fact, the district court asserted, the trial judge recognized counsel's absolute right to object for the record, sustained a number of counsel's objections, overruled many of the prosecution's objections to counsel's questions and tactics, allowed counsel to proceed even when the judge seemed to think counsel was violating evidentiary rules, allowed defense counsel to recall any witnesses that he wanted, and granted most of defense counsel's requests for specific jury instructions. Turning to Gordon's more specific allegations that the trial judge took actions such as telling counsel to sit down and shut up and stepping in after defense counsel asked a question five or six times, the district court determined that these actions did not reflect judicial bias. Although a few of the comments were somewhat sarcastic and some actions, including questioning defense counsel's legal education and holding him in contempt, were "troubling," viewing the record as a whole, the district court reasoned that the judge was just fulfilling his role as the moderator of the trial. Therefore, the district court denied relief, but failed to address Gordon's ineffective assistance of counsel claim.

The district court granted a certificate of appealability on Gordon's judicial bias claim. This court later expanded that certificate of appealability to include Gordon's claim that counsel was ineffective for failing to file a motion for new trial on the basis of judicial bias.

## II.

Habeas relief is governed by the deferential standard stated in the Antiterrorism and Effective Death Penalty Act (AEDPA). AEDPA provides that:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court's factual determinations are presumed to be correct absent clear and convincing evidence to the contrary. *Id.* § 2254(e)(1). A state court's decision is "contrary to" clearly established federal law if it "applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). The decision is an "unreasonable application of" clearly established federal law "if the state court correctly identifies the governing legal principle from [Supreme Court] decisions but unreasonably applies it to the facts of the particular case." *Id.* The Supreme Court has emphasized that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law," *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 410 (2000)), and even a strong case for relief does not render a state court's contrary decision unreasonable. *Harrington v. Richter*, 562 U.S. 86, 101–02 (2011). AEDPA, therefore, "erects a formidable barrier to federal habeas relief." *Burt v. Titlow*, 134 S. Ct. 10, 16 (2013).

## III.

### A.

The State contends that Gordon procedurally defaulted his judicial bias claim. It argues that because the state court cited Michigan Court Rule 6.508(D)(3) in its opinion, the fact that it

alternatively considered the merits of the claim does not prevent this court from finding procedural default.[1]

A petitioner procedurally defaults his claim where (1) he fails to comply with a state procedural rule applicable to his claim; (2) the state courts "actually enforced" that procedural rule; and (3) the default is an "adequate and independent" state ground for foreclosing review of the petitioner's claim. *Willis v. Smith*, 351 F.3d 741, 744 (6th Cir. 2003). The State's argument fails on the second element. The state court cited Michigan Court Rule 6.508(D)(3), which, absent a showing of good cause and prejudice, prohibits a Michigan court from granting relief on a claim that the petitioner could have raised on direct appeal. However, aside from this passing reference to the rule, there is no indication that the court "actually enforced" that rule.

The State's reliance on *Coe v. Bell*, 161 F.3d 320, 330 (6th Cir. 1998), is misplaced. There, the state appellate court held that the petitioner's claim was procedurally barred because his claim was not cognizable under Tennessee's Post-Conviction Procedure Act, which limits post-conviction claims to those presenting errors of a constitutional dimension. *Id.*; *Coe v. State*, No. 138, 1991 WL 2873, at *2, *6. (Tenn. Crim. App. Jan. 16, 1991). We held that the state court's *alternative* holding on the merits did not require us to disregard the state court's finding that petitioner's claim was procedurally barred. *Coe*, 161 F.3d at 330. There is no such alternative procedural ruling here. Therefore, Gordon did not procedurally default his claim.

---

[1] The State also insists that some of Gordon's "claims" of judicial bias are not properly before the court. Specifically, it insists that there are various parts of the record that Gordon did not reference below. Though Gordon must exhaust his state court remedies prior to bringing a federal habeas petition, 28 U.S.C. § 2254(b)(1)(A), the authority cited by the State does not support its contention that, for the purposes of exhaustion, we need to parse the specific instances of alleged judicial misconduct that Gordon raised below. It is sufficient that, on appeal, Gordon raises the same claim of judicial misconduct under the same theories as it did before the district court. *See Vasquez v. Hillery*, 474 U.S. 254, 257–60 (1986) (concluding that the claim had been fairly presented to the state court despite the supplemental statistical data presented to the district court because this evidence "did not fundamentally alter the legal claim already considered by the state courts").

B.

Gordon first disputes the applicable standard of review. He asserts the district court erred in analyzing this case under AEDPA rather than reviewing it *de novo*. Clearly established federal law, he argues, allows petitioners to establish a Due Process claim based on judicial bias even if a judge only gives the appearance of judicial bias. However, the state post-conviction court required Gordon to establish *actual* bias, which makes its decision contrary to clearly established law.

The State responds that Gordon is incorrect that clearly established Supreme Court law prohibits merely the appearance of bias. Moreover, even if the state court did err, the State contends, to determine whether a claim is adjudicated on the merits, our focus must be on the result, not the analysis used to reach it, so the state court's conclusion that Gordon failed to establish a claim of judicial bias is what merits AEDPA deference.

1.

Though it is certainly true that we may conclude that the state court adjudicated a claim on the merits even if it issues a "summary ruling" containing no analysis, *Harrington*, 562 U.S. at 99, it does not follow, as the State insists, that when determining the applicability of AEDPA, we must always look only to the result and ignore the underlying analysis. The Supreme Court has held that a state court decision is "contrary to" clearly established federal law "if the state court *applies a rule* different from the governing law set forth in our cases." *Bell*, 535 U.S. at 694 (emphasis added); *see also Williams*, 529 U.S. at 405 ("A state-court decision will certainly be contrary to our clearly established precedent if the state court *applies a rule* that contradicts the governing law set forth in our cases." (emphasis added)). In announcing this rule, the

Supreme Court[2] in *Williams* used as an example a state court decision that applied a different legal standard than that announced in *Strickland v. Washington*. 529 U.S. at 405–06. In such a scenario, "that decision would be 'diametrically different,' 'opposite in character or nature,' and 'mutually opposed' to our clearly established precedent," resulting in the federal court being "unconstrained by" AEDPA in reaching its decision. *Id.* at 406; *see also Panetti v. Quarterman*, 551 U.S. 930, 954 (2007) (suggesting that habeas relief is available "if either 'the reasoning [or] the result of the state-court decision contradicts'" Supreme Court precedent (alteration in original) (quoting *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam))). Therefore, when the state court applies an improper standard, we apply *de novo* review rather than AEDPA deference. *See Jones v. Bagley*, 696 F.3d 475, 490 (6th Cir. 2012).

2.

Thus, our first inquiry becomes whether the state court actually applied the wrong standard—a standard requiring actual bias in lieu of the mere appearance of bias. In determining clearly established law for the purposes of § 2254(d), we look only to the Supreme Court's holdings, rather than its dicta. *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (per curiam). But we must take care not to extend Supreme Court precedent. *Yarborough v. Alvarado*, 541 U.S. 652, 666 (2004). The Court has cautioned circuit courts not to frame Supreme Court precedents at so high a level of generality that we divine an answer to a specific question that it has yet to resolve. *Lopez v. Smith*, 135 S. Ct. 1, 4 (2014) (per curiam). However, "the difference between applying a rule and extending it is not always clear." *Yarborough*, 541 U.S. at 666.

Though clearly established federal law for AEDPA purposes refers to Supreme Court, not circuit precedent, this court may look to circuit precedent to determine whether it has already held that an issue is clearly established by Supreme Court precedent. *Marshall v. Rodgers*,

---

[2] Justice O'Connor rendered the decision of the Court with respect to the section containing the aforementioned rule.

133 S. Ct. 1446, 1450–51 (2013) (per curiam). The State points to *Railey v. Webb*, 540 F.3d 393 (6th Cir. 2008). There, acknowledging that a judge may be disqualified from a case for the mere appearance of bias, we went on to consider whether the failure of a judge to disqualify him or herself for the appearance of bias constitutes a constitutional violation. *Id.* at 399–400. After engaging in a comprehensive review of Supreme Court and circuit precedent, *id.* at 401–13, we concluded that it was "arguable," not clearly established, that the judge's failure to recuse himself when faced with the possibility of bias constitutes a due process violation, *id.* at 413–14. "We are bound by prior Sixth Circuit determinations that a rule has been clearly established." *Tolliver v. Sheets*, 594 F.3d 900, 916 n.6 (6th Cir. 2010) (citing *Smith v. Stegall*, 385 F.3d 993, 998 (6th Cir. 2004)).[3]

Gordon points us to more recent Supreme Court decisions that he argues establish that actual bias is not required even outside of limited circumstances. Thus, he reasons, *Railey*'s holding is not binding. *See Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985) ("The prior decision remains controlling authority *unless* an inconsistent decision of the United States Supreme Court requires modification . . . ." (emphasis added)). However, these cases support the State's view that appearance of bias is only sufficient to establish judicial bias of a constitutional dimension in a limited class of cases.

The first case is *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009). After a jury returned a verdict against the defendants, but prior to appeal, the defendants donated to a candidate's campaign for Justice of the West Virginia Supreme Court of Appeals, including giving nearly $2.5 million to a political organization supporting the candidate's campaign. *Id.* at

---

[3] Gordon cites *Coley v. Bagley*, 706 F.3d 741 (6th Cir. 2013), in support of his proposition that that the Supreme Court has recognized a general appearance-of-bias standard. However, *Coley* reviewed the petitioner's claim *de novo*, *id.* at 749, so any reliance on the Supreme Court for that standard in "general" judicial bias cases does not render it clearly established for AEDPA purposes.

872–73. That candidate was elected as a Justice, then proceeded to sit on a panel of five Justices and joined the majority opinion reversing the verdict against the defendants. *Id.* at 873–74.

The Court first noted that most matters regarding judicial disqualifications, like personal bias or prejudice, alone, do not rise to a constitutional level. *Id.* at 876–77. However, in certain circumstances, such as when a judge has "a direct, personal, substantial, pecuniary interest" in the case, recusal may be necessary as a matter of constitutional law. *Id.* at 876 (citation omitted). Turning to the issue of bias arising "in the context of judicial elections, a framework not presented in the precedents [the Court has] reviewed and discussed," the Court concluded that it did not need to determine whether there was actual bias. *Id.* at 881–82. It reasoned that the difficulty of ascertaining whether a judge has an actual bias highlights the need for objective standards that do not require a litigant to establish actual bias to succeed on a Due Process claim. *Id.* at 883. To assuage concerns that its decision would create "a flood of recusal motions," the Court observed that "[t]he Due Process Clause demarks only the outer boundaries of judicial disqualifications," and that each Supreme Court case deciding a constitutional recusal issue dealt with standards to address "extreme facts." *Id.* at 887–90 (citation omitted). The Court reasoned that courts are capable of resolving disputes regarding less extreme disqualification situations, without raising constitutional concerns. *Id.* at 888–90.

Though the Court in *Caperton* at times used broad language in reaching its conclusion, a review of the opinion on the whole indicates that it did not intend to extend broadly the circumstances under which an individual can establish a Due Process violation by proving something less than actual bias. It took care to note that this was a unique case involving an "extreme" set of facts, but that most cases did not warrant constitutional consideration.

The Supreme Court's analysis of *Williams v. Pennsylvania*, 136 S. Ct. 1899 (2016), was similar. There, the Court concluded that the decision of the Chief Justice of the Pennsylvania Supreme Court not to recuse himself, despite the fact that he had sought the death penalty against the petitioner when he served as district attorney, violated the petitioner's Due Process's rights. *Id.* at 1905. "To establish an enforceable and workable framework," the Court observed that its "precedents apply an objective standard that, *in the usual case*, avoids having to determine whether actual bias is present." *Id.* (emphasis added). But in reaching this conclusion, it took care to note the similarities between the case before it and a similar case, *In re Murchison*, 349 U.S. 133 (1955), where the Court found there to be an unconstitutional potential for bias when the same person serves both as the accuser and the adjudicator of a case. *Williams*, 136 S. Ct. at 1905–07.

Though *Williams* speaks of applying a standard not requiring actual bias "in the usual case," *id.* at 1905, its emphasis on a case with a similar extreme posture indicates an intent to narrow the rule to cases falling at the outer boundaries of Due Process. The Court did not break new ground in issuing this ruling; like *Caperton*, its holding was based on the "extreme facts" at issue.

We must take care not to extend Supreme Court precedent to determine a class of circumstances with which it has not yet dealt. *Lopez*, 135 S. Ct. at 4. Therefore, the state court, in refusing to apply a mere-appearance-of-bias standard, did not conflict with clearly established federal law. Consequently, we review Gordon's claims under AEDPA.

## C.

According to Gordon, the credibility of eyewitnesses was key to his defense, but the judge's repeated interventions defeated defense counsel's efforts to support his theory of the case

and to rebut the prosecution's version of events. Gordon asserts that the judge exhibited an increasingly unfavorable personal attitude towards defense counsel and continued to "wrangle on an unedifying level" with him; this, combined with the judge's excessive interjection into the examination of the witnesses demonstrates that the judge crossed the line between routine trial administration and "deep-seated favoritism or antagonism." Appellant Br., CA6 R. 15 at 41 (citations omitted). The State rebuts that, on the whole, the challenged remarks did not reflect actual bias, but were rather appropriate responses to defense counsel's overzealous conduct.

1.

The alleged conduct committed by the judge can be divided into two broad categories: (1) the judge's intervention into defense counsel's questioning of witnesses and purported provision of assistance in the prosecution's case, and (2) the judge's reprimands of defense counsel.

a.

The judge interrupted defense counsel's questioning of witnesses on multiple occasions. In one instance, during the cross examination of Ms. Todd, the court intervened when defense counsel probed her for details about the fight between Walker and Jackson and again when he inquired into Ms. Todd's statement that she did not care what Todd said before he was killed. The judge thought that neither of these questions sought to elicit relevant information. Later when questioning this witness, defense counsel seemingly attempted to impeach her by noting that she testified that she searched a car for her daughter Walker's purse, but did not tell the police that in her statement. He then summarized his point, stating: "Now, at one point, you got out and searched the car. At another point, you don't get out and search the car." Trial Tr. Vol. I 149, ECF No. 22-3, Page ID 456. The judge then interjected, stating that "the jury makes the

determination of whether or not there are any differences. You've explored that, they've heard it." *Id.* at 150, Page ID 457.

One of these occasions evoked laughter. Defense counsel asked a witness, Cozette Gordon, *why* she did not hear the gunshots even though she heard a commotion. The prosecution objected and the judge responded: "She said she didn't hear it. That's it." *Id.* at 220–21, Page ID 527–28. The judge did not comment on the apparent laughter from the audience.

Also, during the prosecution's cross examination of witnesses, the judge interjected at least three times when the witness appeared to evade the question.

Although, many times, defense counsel would simply accept the court's ruling, on numerous occasions, he would proceed to bicker with the judge about the correctness of the ruling. Additionally, at least twice, he accused the judge of treating him differently than the judge treated the prosecutor.

b.

The judge also reprimanded defense counsel several times during the course of the trial. On the first day of trial during cross examination, defense counsel asked a witness about the original description he gave of the perpetrator. The witness asked to refer to his statement; defense counsel responded by asking whether the witness had already seen the statement that day. When defense counsel continued to argue and refused to give the witness the statement, even after the judge twice told him to, the judge responded: "[H]ow many times do I have to tell you that, Mr. Price? Give the man the statement." *Id.* at 197, Page ID 504. The judge then allowed defense counsel to ask whether he had seen the statement earlier that day.

Also that day, when the judge ruled that Ms. Todd's feeling that she did not care what Todd said before he was killed was irrelevant, defense counsel proceeded to argue about the

ruling, insisting that he had the right to ask. The judge asked defense counsel whether he had any other questions, but when counsel persisted in arguing, the judge declared: "Mr. Price, you have a right to do one thing right now, you have a right just to sit down. You have a right to sit down, so would you please sit down." *Id.* at 156, Page ID 463. Price apparently did so.

Several times, defense counsel implied that the judge was biased, which provoked a negative reaction from the judge. For example, on the second day of trial, after the judge took issue with defense counsel's question to Walker about why Todd and Ms. Todd were upset the day of the shooting, defense counsel protested: "Well, Judge, you didn't say anything when the Prosecutor asked her that question." Trial Tr. Vol. II 72, ECF No. 22-4, Page ID 612. The judge responded:

> You do that one more time, and you're going to be held in Contempt of Court. . . .
> Don't you ever, ever accuse the Court of being biased in any way. You know
> better than to do that, and I don't know if anybody else tolerates it, but I won't.
> Don't you ever do that again. Do you understand me?

*Id.* at 73, Page ID 613.

On the third day of trial, after the judge felt that defense counsel had "chastised" him, the judge recommended that defense counsel use a bit more diplomacy in his tone, stating sarcastically, "[D]on't they teach you legal courtesy in law school these days?" Trial Tr. Vol. III 52, ECF No. 22-5, Page ID 799. Failing to heed the judge's advice, later that day, when defense counsel argued with the judge's insistence that a defense witness answer the question that she was asked, defense counsel again disputed his ruling. The judge responded: "Mr. Price, I'm not going to ask you. Would you please sit down. I'm ruling." *Id.* at 139, Page ID 886. When defense counsel continued, the judge again declared, "Mr. Price, would [you] sit down and shut up for a moment." *Id.* Shortly thereafter, when defense counsel took issue with the prosecutor's question that the defense witness "claim[ed]" that she had important information, the judge

interjected again, stating: "There's only one Judge in this court now. I keep telling you that. I have made a ruling. She can ask a question. You can ask the question. But you cannot argue with the Court." *Id.* at 140, Page ID 887. In response, when defense counsel finally stated simply, "I object, Judge," the judge replied, "Thank you. Your objection is on the record. Now would you please sit down." *Id.*

The tension between defense counsel and the judge came to a head during the prosecution's closing argument. In response to the prosecution's argument that, by calling the evidence tech as the last witness, she was not trying to hide evidence, defense counsel objected, stating, "I don't know that. And that's not part of any record." Trial Tr. Vol. IV 65, ECF No. 22-6, Page ID 1009. As the judge attempted to explain by stating, "Okay, Mr. Price, since you brought that up, we did adjourn court early one day because . . . . ," defense counsel interrupted, repeatedly asserting, "How dare you, Judge?" and continually declaring his objection until the judge excused the jury from the courtroom. *Id.* at 65–66, Page ID 1009–10. Prior to excusing the jury, the judge stated that defense counsel "made a false statement." *Id.* at 65, Page ID 1009. Outside of the jury's presence, the judge reprimanded defense counsel for implying that the prosecutor was being deceptive, and held him in contempt, ordering him to pay a $100 fine.[4] When the jury returned, the judge explained "the truth of the matter," namely, that the evidence tech was elsewhere on the day he was to testify, and though officers were sent to look for him, they could not find him, so the prosecution decided to call him the next day. *Id.* at 69, Page ID 1013.

### 2.

The Due Process Clause establishes a "constitutional floor," which requires that parties be given "a 'fair trial in a fair tribunal' before a judge with no actual bias against the defendant

---

[4] The judge later rescinded this fine.

or interest in the outcome of his particular case." *Bracy v. Gramley*, 520 U.S. 899, 904–05 (1997) (internal citation omitted). So central is this right that failure to have a trial before such an impartial adjudicator can never be a harmless error. *Gomez v. United States*, 490 U.S. 858, 876 (1989). Though trial by an impartial judge is a core right, we must consider the judge's alleged bias in light of his or her role in the courtroom. During a jury trial, "the judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct." *Quercia v. United States*, 289 U.S. 466, 469 (1933). So "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky v. United States*, 510 U.S. 540, 555 (1994).[5] In "the rarest circumstances," judicial rulings can constitute the basis for a bias claim if they "display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Id.* However, even if a judge makes remarks that are "critical or disapproving of, or even hostile to, counsel" or if the judge conveys feelings of "of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display" his or her conduct will not amount to a constitutional violation. *Id.* at 555–56. An example of the sort of deep-rooted antagonism that would constitute a Due Process violation is a judge describing German-American defendants as having "hearts . . . reeking with disloyalty." *Id.* at 555 (citation omitted). In short, most allegations of judicial bias will not give rise to a constitutional cause of action. *See Caperton*, 556 U.S. at 890.

A fitting case to illustrate this point in the context of allegations, such as we have here, that the judge feels a deep disdain for counsel or a party, is *Ungar v. Sarafite*, 376 U.S. 575 (1964). As a witness in a criminal trial, the petitioner made contemptuous remarks about the

---

[5] *Liteky* involves 28 U.S.C. § 455(a), a judicial disqualification statute, but we have applied its reasoning to constitutional judicial bias claims. *See Alley v. Bell*, 307 F.3d 380, 386 (6th Cir. 2002).

presiding judge; the petitioner insisted that because his remarks were a personal attack on the judge, it biased the judge and disqualified him from presiding at the petitioner's contempt hearing. *Id.* at 580, 583. After being found guilty of contempt, the petitioner claimed that the judge's failure to recuse himself deprived the petitioner of his constitutional right to a fair contempt hearing. *Id.* at 583. The Court concluded that, unlike other contempt cases "in which the Court found personal bias sufficient to disqualify the judge from convicting for contempt, this record does not leave us with an abiding impression that the trial judge permitted himself to become personally embroiled with petitioner." *Id.* at 585. The judge here "dealt firmly with [petitioner], but without animosity." *Id.* at 585–86. So it concluded that it could not "say there was bias, or such a likelihood of bias or an appearance of bias that the judge was unable to hold the balance between vindicating the interests of the court and the interests of the accused." *Id.* at 588.

Viewing the record as a whole, the judge's conduct throughout the course of the trial does not show the type of "deep-seated favoritism or antagonism" that would "leave us with an abiding impression that the trial judge permitted himself to become personally embroiled with [defense counsel]" so as to constitute a Due Process violation. *See Liteky*, 510 U.S. at 555; *Ungar*, 376 U.S. at 585. Gordon insists that the judge persistently interjected when his counsel would attempt to present important evidence in his case. Notably, however, Gordon does not attempt to argue that the questions defense counsel asked or the answers he sought to elicit were not actually objectionable. Further, many of the harsher statements made by the judge were not in response to the questions defense counsel asked the witnesses, but rather to defense counsel's obstinate behavior in engaging in a debate after the judge made a ruling. The judge has the authority to maintain control over the courtroom, *Quercia*, 289 U.S. at 469, but the judge also

has a duty of respect to the litigants. Though defense counsel had the right to object to the court's ruling to preserve the record, he was not entitled to dispute the issue in front of the jury. Notably, when defense counsel finally stopped arguing with the judge and simply responded, "I object, Judge," the judge replied, "Thank you. Your objection is on the record. Now would you please sit down." Trial Tr. Vol. III 140, ECF No. 22-5, Page ID 887.

It is true that various statements made by the judge could certainly be considered inappropriate and lacking in tact.. We also emphasize that our holding today in no way relieves judges of their duties to not only refrain from presiding over cases in which they harbor a bias against an attorney or party, but to also avoid the mere *appearance* of impropriety. Parties have the right to an impartial judge, and we must stand unwavering in our commitment not to impinge upon this right. Yet the judge's critical remarks that reflected "impatience, dissatisfaction, annoyance, and even anger . . . are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display"; they are outside the realm of unconstitutional conduct. *See Liteky*, 510 U.S. at 555–56. In all, it cannot be said that the judge treated the defense unfairly or was too one-sided to be considered impartial. Indeed, as the district court noted, there were various instances throughout the trial where the trial court ruled in defense counsel's favor and against the prosecution. The record does reflect that the judge became increasingly frustrated with defense counsel's steadfast refusal to accept the judge's rulings. Nonetheless "[w]e cannot assume that judges are so irascible and sensitive that they cannot fairly and impartially deal with resistance to their authority or with highly charged arguments about the soundness of their decisions." *Ungar*, 376 U.S. at 584.

Gordon has failed to establish that the judge exhibited conduct sufficient to establish unconstitutional judicial bias. Accordingly, we cannot conclude that the state court's determination was contrary to or an unreasonable application of clearly established federal law.

D.

1.

With respect to Gordon's ineffective assistance of counsel claim, he asserts that the state court did not adjudicate it on the merits, so it is subject to *de novo* review.

The state court did not address Gordon's ineffective assistance of counsel claim, even though it addressed the analogous judicial bias claim and several other allegations of ineffective assistance of counsel. Because this claim was "inadvertently overlooked in state court," we review *de novo*. *See Johnson v. Williams*, 133 S. Ct. 1088, 1097 (2013) ("When the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court, § 2254(d) entitles the prisoner to an unencumbered opportunity to make his case before a federal judge.").

2.

Gordon argues that defense counsel rendered constitutionally deficient performance in not moving for a new trial based on his claim of judicial bias because defense counsel had no good reason for his failure to do so.

To establish an ineffective assistance of counsel claim, Gordon must show that his counsel's performance was deficient, and that this deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Because the judge's conduct is more reflective of a frustration with defense counsel's overzealous advocacy rather than any bias against him or Gordon, his claim would have failed even under *de novo* review. Accordingly,

his underlying ineffective assistance of counsel claim fails as well because Gordon cannot establish judicial bias. *See Henness v. Bagley*, 644 F.3d 308, 319 (6th Cir. 2011).

IV.

For the foregoing reasons, we **AFFIRM**.